IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VANESTA RODRIGUEZ, MANUEL CAMACHO, DIMITRI DEJESUS, a Minor, by and through his mother, VANESSA RODRIGUEZ, ) ) ) ) ) ) Plaintiffs, ) ) vs. ) ) ) CITY OF BERWYN, ) Berwyn Police Officers ) KARLAS ROBINZINE, Star No. 205, ) ROBERT ARNONY, Star No. 218, ) TIMOTHY KESKE, Star No. 200, ) JIM RITZ, Chief of Police, ) ) Defendants. ) | Case No. 2016-cv-5106 Judge Gary Feinerman |

*(Caption reproduced as printed.)*

**DEFENDANTS' JOINT 56.1 STATEMENT OF UNDISPUTED FACTS**

*Parties and Basis for Jurisdiction*

1. This case is brought by Plaintiffs Vanessa Rodriguez, Manuel Camacho, and Dimitri DeJesus. (Pltfs.' Comp., Doc. # 1). Vanessa Rodriguez and Manuel Camacho are in a relationship and were in a relationship at all times relevant to this Complaint. (Rodriguez Dep. 22:10-17). Dimitri DeJesus is Vanessa's son. (Rodriguez Dep. 24:14-16).

2. The Defendants are City of Berwyn, Karlas Robinzine, Robert Arnony, Timothy Keske, and Jim Ritz. (Doc. # 1).

3. The claims brought by Plaintiffs are: (1) Equal Protection – Class of One – 42 U.S.C. § 1983; (2) Substantive Due Process – 42 U.S.C. § 1983; (3) Civil Conspiracy – 42 U.S.C. § 1983; (4) Civil Conspiracy – State Law; (5) Unlawful Entry of the Home – 42 U.S.C. § 1983; (6) Unlawful Arrest – 42 U.S.C. § 1983; (7) Excessive Force – 42 U.S.C. § 1983; (8) Intentional Infliction of Emotional Distress; (9) Negligent Infliction of Emotional Distress; (10) Supervisor Liability – 42 U.S.C. § 1983; (11) Inadequate Training or Supervision – 42 U.S.C. § 1983; (12) Indemnification Claim pursuant to 745 ILCS 10/9-102. (Doc. # 1).

1

4. This Court has subject matter jurisdiction over the § 1983 claims pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. (Doc. # 1).

5. Defendant City of Berwyn is an Illinois municipal corporation. (City's Ans., Doc. # 34).

6. Defendant Jim Ritz was the Chief of Police for the City of Berwyn from April 27, 2010 to April 27, 2017. (Ritz Dep., Ex. 1, 10:14-17).

7. The last day Jim Ritz was physically present at the Berwyn Police Department as Chief of Police was in May or June of 2016. (Ritz Dep. 58:2-4).

8. Defendant police officers Arnony, Robinzine and Keske are duly sworn and appointed police officers. (Arnony Ans., Doc. # 30; Robinzine Ans., Doc. # 32; and Keske Ans., Doc. # 35).

9. Defendant Robert Arnony has been employed with the Berwyn Police Department for 28 years. (Arnony Dep., Ex. 2, 20:6-11).

10. Defendant Robert Arnony was a detective, assigned to the criminal division of the Berwyn Police Department in 2013 and 2014. (Arnony Dep. 53:12-19).

11. Defendant Timothy Keske has been a patrol officer with the Berwyn Police Department since 2010, with the exception of three years when he served as a tactical officer for the Department. (Keske Dep., Ex. 3, 9:19-10:2; 11:5-11:24).

12. Defendant Karlas Robinzine was a detective, assigned to the juvenile division of the Berwyn Police Department from 2010 to 2016. (Robinzine Dep., Ex. 4, 113:3-5).

*Training Provided to Officers and Detectives from the City of Berwyn*

13. Every sworn police officer from the City of Berwyn is required to successfully complete a state certified police academy, which includes topics such as report writing, probable cause, arresting and detaining suspects, and using force to effect an arrest. (Scardamaglia Affid., Ex. 5, ¶ 5). The training received in the police academy is reinforced and supplemented through a three-month long field training program provided by the City. (Scardamaglia Affid., ¶ 6). During the field training, officers are assigned to a senior officer during his or her shift; the purpose of the field training is to reinforce the material learned in the academy, as well as teach officers about the policies, procedures, and regulations of the Berwyn Police Department. (Scardamaglia Affid., ¶ 6). Satisfactory completion of the field training program is mandatory. (Scardamaglia Affid., ¶ 6).

14. The City also requires all officers to go through a week-long training program each year, which includes mandatory re-certification, information pertaining to new or revised policies, and any other issues presented by the officers, frequently use of force related topics. (O'Halloran Dep. Part 1, Ex. 6, p. 70-72).

15. All officers with the Berwyn Police Department have access to the Department's policies and procedures, which they are expected to know, and for which the Department provides on-going training for on an as-needed basis. (O'Halloran Dep., Part 1, p. 70-72 and Part 2, Ex. 7, p. 9-11). The Department's policies and procedures includes objectives and duties of the Detective Unit. (Ex. 6 of O'Halloran Dep., Part 1, bates stamped document Arnony000647, Ex. 8).

16. In addition to the training received by patrol officers, detectives with the Berwyn Police Department go through advanced training to become certified lead homicide investigators. (Scardamaglia Affid., ¶ 7). All detectives with the Berwyn Police Department are either certified lead homicide investigators or enrolled in training to become certified. (Scardamaglia Affid., ¶ 7). To become certified, officers participate in a forty-hour training program so that they become a certified lead homicide investigator pursuant to the Illinois statute, 50 ILCS 705/10.11. (Scardamaglia Affid., ¶ 7). The training program includes advanced training and education related to conducting police investigations. (Scardamaglia Affid., ¶ 7).

17. In addition to all of the above-mentioned training, officers attend ongoing training provided by third-party providers based on a particular officer's interests and focus within the police department, as well as ongoing training provided by the Berwyn Police Department. (Scardamaglia Affid., ¶ 8; O'Halloran Dep. Part 1, p. 70-72).

*Assignment of Cases to Detectives in Criminal Division of the Berwyn Police Department*

18. In the criminal division, detectives' assignments were either assigned by the unit commander or second in charge. (Arnony Dep. 20:18-21).

19. The majority of a detective's cases come from the patrol division, where a report has been taken following an incident. (Ramon Ortiz Dep., Ex. 9, 64:1-3).

20. Arnony was the detective assigned to investigate both the burglary of Margarita Rodriguez's house and the criminal damage to property to Margarita Rodriguez's vehicle and assault case. (Arnony Dep. 91:11-20). He was assigned to investigate both cases by his supervisor, Sergeant Ramon Ortiz. (Ortiz Dep. 83:19-25, 84:1-10, 85:19-25, 186:1-25, 187:1-25, 188:1-22).

3

*Burglary Investigation*

21. In February of 2014, Margarita Rodriguez ("Rubia") filed a criminal complaint against her daughter Vanessa Rodriguez alleging that she had burglarized her home. (Doc. # 30, ¶ 20).

22. Arnony first met Margarita Rodriguez in February of 2014. He was assigned to the investigation of a burglary to a residence. She was the complainant in the burglary. He had never met her before he was assigned her burglary investigation. (Arnony Dep. 54:15-25, 253:1-25).

23. Arnony did not take the initial report on the burglary investigation. It was subsequently assigned to him. (Arnony Dep. 139:14-21).

24. Arnony went to the home of Rubia Rodriguez by himself to investigate the burglary. (Arnony Dep. 56:6-11).

25. Margarita Rodriguez also reported to Detective Arnony that Vanessa had forged her signature on paperwork filed with the Secretary of State transferring title for a 2005 Pontiac Vibe to Rubia. (Doc. # 30, ¶ 22).

26. Detective Arnony informed the Illinois Secretary of State Police of the claim made by Rubia that Vanessa forged documents that transferred the title for a 2005 Pontiac Vibe to her from Rubia. (Doc. # 30, ¶ 22).

27. After being assigned the burglary investigation, on March 1, 2014, Arnony drafted a premise watch of Margarita Rodriguez's residence that he sent out to Berwyn Police Department members. (Arnony Dep. 151:12-18, 154:7-13; Ex. 13 of Arnony Dep., bates stamped document "Robinzine 1084," attached as Ex. 10). Margarita Rodriguez requested the premise watch because she was the victim of a burglary that she believed had been committed by her daughter Vanessa. (Arnony Dep. 155:8-16). There was also an ongoing financial dispute between Margarita and her daughter Vanessa, and Margarita was afraid that Vanessa was going to come over and damage her property. (Arnony Dep. 155:16-19). Premise watches can often be sent via email or drafted in memorandum style. There is no protocol to distinguish between the two styles of issuing them in the Berwyn Police Department. (Arnony Dep. 157:1-12).

28. The only time Arnony had ever met Vanessa Rodriguez or Manuel Camacho was when he interviewed them about the burglary on April 5, 2014 at the police station. (Rodriguez Dep., Ex. 11, 171:1-25, 172:1-14). Vanessa Rodriguez and Manuel Camacho were never charged with any crimes with regards to Arnony's burglary investigation. (Rodriguez Dep. 176:24, 177:1-5).

29. The burglary investigation began on February 26, 2014 and was closed on April 17, 2014. (Ex. 5 of Arnony Dep. 103:13-19). At that point in time, Arnony had no

4

physical evidence, no witnesses, and nothing connecting Vanessa Rodriguez to the burglary of her mother's home. That portion of the case was closed, and no arrests were made. (Ex. 5 of Arnony Dep. 103:13-19; 131:12-16; Doc. # 30, ¶25).

*Criminal Damage to Property Investigation*

30. On July 25, 2014, Manuel Camacho and Vanessa Rodriguez went over to Margarita Rodriguez's house (Vanessa's mother) to confront her about filing a forgery complaint against Vanessa and an argument ensued between them. (Camacho Dep., Ex. 12, 278:1-24, 279:1-2). Rodriguez admitted she signed her mother's name on documents from the Secretary of State without her mother's permission; however, she apparently contradicted herself, denying that she signed her mother's name on documents at the DMV. (*Compare* Rodriguez Dep. 208:2-209:1 *with* Rodriguez Dep. 161:15-17). Camacho is aware that Vanessa forged her mother's signature on the Secretary of State title documents. (Camacho Dep. 279:1-13). After the incident, Margarita called 911 and accused Camacho of breaking her car mirrors. (Camacho Dep. 294:1-6).

31. On July 26, 2014, at approximately 12:20 a.m., members of the Berwyn Police Department investigated the complaint and made no arrest. (Doc. # 30, ¶ 29).

32. Arnony interviewed witnesses on each side of the criminal damage to property investigation. The only non-biased witness he interviewed was a neighbor who was walking his dog in the area. (Arnony Dep. 221:21-25, 222:1-5).

33. Arnony interviewed Margarita Rodriguez on September 1, 2014 – she indicated to him that she saw Camacho break the mirrors on her car. (Arnony Dep. 161:15-25, 162:1-25; 163:1-14).

34. On November 13, 2014, Arnony called Vanessa Rodriguez and insisted that Vanessa and Manuel come to the police station to answer question about the criminal damage to property. (Rodriguez Dep. 46:1-47:5). Rodriguez and Camacho never went to the police station during the investigation of criminal damage to property. (Rodriguez Dep. 46:1-24, 47:1-8). On the call, Arnony informed Vanessa that they were still pursuing the charges. (Rodriguez Dep. 181: 19-21).

35. Arnony drafted and sent out a premise watch for Margarita Rodriguez's residence in January of 2015 based on her request. (Arnony Dep. 156:22-25, 157:13-15; Ex. 13 of Arnony Dep., bates stamped document "Robinzine 1084"). As part of the premise watch, Arnony included the reason for the premise watch and that there was an ongoing investigation related to criminal damage to property at Margarita's residence that occurred in July of 2014. (Arnony Dep. 157:16-24). He further indicated that Camacho was wanted by the Department pursuant to the criminal damage to property complaint, that there was no warrant for Camacho but that probable cause to detain and question Camacho for questioning existed. (Arnony Dep. 157:13-25, 158:1-25,

159:1-22). Arnony included the information in the premise watch he thought he needed to be included in there. (Arnony Dep. 168:12-13).

*Arrest of Vanessa Rodriguez and Manuel Camacho*

36. Officer Keske received an email containing the premise watch memo drafted by Arnony, which was sent to Patrol, Tactical, Juvenile, and Detective units of the Berwyn Police Department on January 2, 2015. (Keske Dep. 74:25-75:3; KESKE 000367, Ex. 13). The premise watch was also discussed during his January 5, 2015 roll call. (Keske Dep. 91:12-91:21).

37. On January 5, 2015, Camacho called the Berwyn Police Department to report that the license plate had been removed from Rodriguez's vehicle, a white Pontiac. (Camacho Dep. 159:11-159:20; Rodriguez Dep. 120:18-120:21; Keske Dep. 37:14-37:17). Camacho was aware that the Secretary of State Police had taken the license plate, but called the Berwyn Police because a relative who was a Chicago police officer told him to "document everything." (Camacho Dep. 154:24-156:15). Pursuant to Camacho's call to the police, Officer Keske was dispatched to the residence of Camacho and Rodriguez; ultimately, officers arrested Camacho and Rodriguez on January 5, 2015. (Keske Dep. 36:21-38:18; Doc. # 34, ¶ 53-54). Between the time Officer Keske was dispatched to Camacho's house and the time he arrived, he did not have any communication with anyone. (Keske Dep. 46:21-47:1). Robinzine never directed Keske to arrest Camacho or Rodriguez. (Keske Dep. 103:17-23).

38. When Officer Keske arrived at Rodriguez's and Camacho's residence, he knocked and Camacho opened the door. (Camacho Dep. 160:1-160:8). Camacho knew Officer Keske was a police officer with the Berwyn Police Department because he was in uniform and he showed up in his patrol car. (Camacho Dep. 160:18-160:21). After Camacho opened the door to his house, Camacho told Officer Keske that he needed to report a stolen license plate, after which Camacho stepped outside to show him the vehicle. (Camacho Dep. 168:17-170:5; Rodriguez Dep. 123:16-124:13; Keske Dep. 48:14-48:19). Camacho took Officer Keske around the back of the house to see the car, and Officer Keske took the VIN number and make and model of the car. (Camacho Dep. 170:14-171:13). While Camacho was showing Officer Keske the car, he told Officer Keske that he and Rodriguez had an issue with Rodriguez's mother and a fraud case with the Secretary of State. (Keske Dep. 48:20-49:4).

39. After Camacho showed Officer Keske the vehicle, Officer Keske went back to his patrol car and Camacho went inside his house. (Camacho Dep. 171:22-172:2; Rodriguez Dep. 124:14-124:23; Keske Dep. 49:10-49:21). After returning to his patrol car, Officer Keske radioed in to dispatch to check Camacho's name in law enforcement databases because he was reminded by Camacho's story about his issues with Rodriguez's mother about the premise watch memo discussed during roll call and

6

recalled that Camacho was wanted and there may be probable cause to detain him. (Keske Dep. 49:22-51:4, 51:21-54:4).

40. Officer Keske interpreted the language in the premise watch memo that stated that "probable cause does exist to detain Camacho for questioning" in relation to a complaint of criminal damage to property to mean that he should arrest Camacho. (Keske Dep. 92:14-93:4; KESKE 367). Officer Keske had previously arrested people based on similar language in alert flyers. (Keske Dep. 80:15-80:19).

41. Although the name check for Camacho came back negative, Officer Keske then received a communication from Sergeant McDonnell asking if Officer Keske was still with Camacho and confirming that Camacho was wanted. (Keske Dep. 54:8-55:7). Officer Keske then decided to arrest Camacho for criminal damage to property based on the premise watch memo and Sergeant McDonnell's confirmation that Camacho was wanted. (Keske Dep. 56:9-57:8). Officer Keske did not speak with anyone other than Sergeant McDonnell and dispatch between the time that he first spoke with Camacho and the time he arrested him. (Keske Dep. 80:10-80:14).

42. After deciding to take Camacho into custody, Officer Keske called for backup and waited for a backup unit to arrive. (Keske Dep. 58:5-59:5). Officer Keske and the backup officer, Officer Massuci, then approached Camacho's house, Camacho opened the door, and Officer Keske advised Camacho that he was being placed under arrest. (Camacho Dep. 174:11-175:12; Keske Dep. 59:7-60:3). At that point, Camacho was standing on the threshold of his door. (Camacho Dep. 176:2-176:4; Rodriguez Dep. 125:5-125:10). Camacho attempted to close the door, but Officer Keske stopped him from doing so. (Camacho Dep. 175:14-176:9; 233:18-233:22).

43. Officer Keske is five feet, seven inches tall and weighs 170 pounds. (KESKE 000039, Ex. 14). Camacho is six feet tall and, at the time of his arrest, weighed 200 pounds. (Camacho Dep. 48:21-49:4). Furthermore, Camacho has training in boxing, Muay Thai, and jujitsu. (Camacho Dep. 237:11-237:20). Nonetheless, despite having at least a five-inch height advantage, a thirty-pound weight advantage, and mixed martial arts training, Camacho claims that Officer Keske single-handedly forced open the door, tackled him, and pinned him to the ground "so fast that another officer already had his knee on [Camacho's] leg." (Camacho Dep. 175:22-176:17; Rodriguez Dep. 126:11-126:13).

44. Camacho further claims that, while Officer Keske was tackling him, Officer Keske was able to prevent himself from falling on top of Camacho by holding himself up on a wall, and that Officer Keske simultaneously got on top of Camacho with both of his knees. (Camacho Dep. 232:11-232:19). Camacho claims that Officer Keske held Camacho to the floor with both knees on his chest and Officer Massuci had his knee on Camacho's leg, and that no other officers restrained or touched Camacho at that point. (Camacho Dep. 176:14-176:17, 180:22-181:2). Officer Keske handcuffed Camacho but did not take Camacho to any patrol car. (Camacho Dep. 182:4-182:6,

184:13-184:17; Keske Dep. 61:7-61:16). Officer Keske did not punch, kick, or strike Camacho at any time. (Camacho Dep. 253:1-253:5).

45. When Officer Keske opened the door to tackle Camacho, Rodriguez ended up behind the door (Rodriguez Dep. 126:15-126:17). Rodriguez claims that she "jumped over" Officer Keske while he was engaged with Camacho on the floor, (Rodriguez Dep. 126:15- , 130:2-130:5), and Officer Keske claims that Rodriguez struck him in the back while he was trying to take Camacho into custody. (Keske Dep. 61:10-61:13). After handcuffing Camacho, Officer Keske restrained Rodriguez by the forearm and handcuffed her but did not strike Rodriguez at any time. (Rodriguez Dep. 133:4-133:5; 133:22-134:12). At no point did Rodriguez tell Officer Keske that her handcuffs were too tight. (Rodriguez Dep. 136:4-136:6). DeJesus was not arrested or handcuffed. (DeJesus Dep. 107:7-11). DeJesus was taken with Camacho and Rodriguez because at the time of their arrest he was a minor. (DeJesus Dep. 66:13-68:22)

*Prosecution of Vanessa Rodriguez and Manuel Camacho*

46. Court records reflect that Camacho's criminal case had thirteen dates from February 2015 through August 2016. <u>On June 3, 2015, Camacho's court appearance was waived.</u> *See* Court Records attached as Ex. 15.

47. On January 27, 2016, Judge Maryam Ahmad found that there was "ample probable cause" at the conclusion of the probable cause hearing related to Camacho's criminal case. (1/27/16 Hearing Transcript, Ex. 16, 137:20-138:1).

*48*. The criminal case was dismissed after it was pending for approximately eighteen months – in August 2016. (Camacho Dep. 297:12-20; Court Records, Ex. 15).

*Parking Tickets*

49. Camacho and Rodriguez were issued 8 to 9 parking tickets for various violations. All of them but one were dismissed. Rodriguez paid the one that was not dismissed. (Rodriguez Dep. 55-58; Camacho Dep. 194).

*Other Berwyn Police Department Interactions*

50. Camacho and Rodriguez live about four or five blocks from the Berwyn police station and also live near a park where there is a significant amount of "police activity." (Camacho Dep. 335:21-336:2).

51. The only time Rodriguez ever had any interaction with Officer Keske was January 5, 2015 (Rodriguez Dep. 120:11-120:14) and she does not believe that Officer Keske has done anything to harass her since that date. (Rodriguez Dep. 141:20-141:23). Similarly, the first and only time that Camacho ever interacted with Officer Keske was January 5, 2015 (Camacho Dep. 225:14-225:19). Since January 5, 2015, Officer Keske has

not spoken to Camacho or Rodriguez. (Keske Dep. 64:22-65:21). Officer Keske did not speak to DeJesus on January 5, 2015, or any time thereafter. (Keske Dep. 65:17-65:21).

52. Vanessa Rodriguez personally never experienced any stalking outside the residence or on roadways. She was never pulled over. (Rodriguez Dep. 53:14-24, 55). Her husband was pulled over but never by any of the Defendants. (Rodriguez Dep. 223:1-24).

53. Camacho once got pulled over on Ridgeland. The officer did not give him a ticket and let him go after laughing. Another time an officer stopped Plaintiffs in a park very early in the morning but did not address them by name and just told them they should not be there that early. (Camacho Dep. 190:21-192:17).

54. During 2014, Vanessa saw police cars drive by her house; and she recalls one picture of her car she believes Robinzine took. (Rodriguez Dep. p. 51-52). Vanessa has no idea if the police she saw were conducting other business. (Rodriguez Dep. 223:5-7). Camacho observed a squad car parked at end of block about 9-10 houses down when he went to work. (Camacho Dep. 189:1-24).

55. During their criminal court appearances, Officer Keske would wave at Camacho and Rodriguez, and Arnony would give them dirty looks. (Camacho Dep. 196:17-197:5; Rodriguez Dep. 139:3-18).

56. Even though Arnony never threatened her, Rodriguez found it intimidating for law enforcement officials to call her during the course of the ongoing investigations. (Rodriguez Dep. 60:14-18, 214:10-17). For example, Robinzine called her one day and said, "I am calling on behalf of your mom, letting you know that she's filing a burglary charge against you. You know what you did, so why don't you just go to the police station and we can figure this out." (Rodriguez Dep. 61:1-23). The calls from law enforcement were the only specific acts of alleged intimidation Rodriguez could recall. (Rodriguez Dep. 62:3-6).

57. DeJesus lives with his mom, Rodriguez, and Dad. (DeJesus Dep., Ex. 17, 13:1-10). DeJesus noticed a Berwyn police vehicle parked at the end of his block once or twice per week, with an unidentified officer inside; this pattern lasted one or two months. (DeJesus Dep. 102:13-104:16). He never saw officers outside of their cars on his street, and he was never followed by an officer. (DeJesus Dep. 105:5-12). DeJesus never told Camacho or Rodriguez about observing police on their block, and neither Camacho nor Rodriguez mentioned to DeJesus that they felt the police were following them. (DeJesus Dep. 105:13-106:14).

58. DeJesus did not know Robinzine prior to 2014 and only knows of him through the lawsuit. (DeJesus Dep. 147:21-148:4). He has never been stopped by Robinzine on the street, Robinzine has not harassed him, and Robinzine has never

9

arrested him. (DeJesus Dep. 148:5-12). DeJesus has never received a citation from the Berwyn Police. (DeJesus Dep. 107:8-10). DeJesus has not had the police stop him or talk to him other than the night of the incident. (DeJesus Dep. 164:4-8). DeJesus has not been arrested without a warrant, has not had a false report filed against him, and has not had litigation brought against him by the police. (DeJesus 169:15-170:1).

59. Chief Ritz did not even know about the allegations that form the basis of Plaintiffs' Complaint until the lawsuit was made known to the media. (Ritz Dep. 16:6-8). Additionally, none of the Plaintiffs knew Chief Ritz or have spoken to him; he was named in the case because he works for the police department. (Camacho Dep. 103:20-104:5; DeJesus Dep. 106:15-107:2; Rodriguez Dep. 34:23-35:20).

60. Camacho was fine with Robinzine when Robinzine stopped by Camacho's house less than five times for a drink or meal. (Camacho Dep. 114:11-115:3). The two have never had an argument. (Camacho Dep. 115:12-16). One time, Robinzine told Camacho, "to stay out of trouble young man, that this is what you can get when you mess with the police or when you mess with someone;" this was the only time Camacho claims Robinzine intimidated him. (Camacho Dep. 196:17: 199:1).

61. Rodriguez is unable to say how Keske, Arnony, or Robinzine discriminated against her. (Rodriguez Dep. 216:1-24, 218:9-10). Camacho claims Defendants discriminated against him because he knew Robinzine and Rubia. (Camacho Dep. 273:8-274:5).

62. Ultimately, the purported campaign of harassment, oppression, and discrimination only lasted from the time the Berwyn Police Department initiated the burglary investigation until Plaintiffs' arrest on January 5, 2015. (Camacho Dep. 265:10-22; Rodriguez Dep. 214:5-6).

*The Robinzine-Rubia Rodriguez Relationship*

63. No one with the Berwyn Police Department knew of Robinzine's extramarital affair with Margarita Rodriguez; Robinzine hid the affair from the Department. (Ritz Dep. 23:1-4; Ortiz Dep. 73:14-74:25; Arnony 118:11-14, 122:22-29; O'Halloran Dep, Part 1 52:24; Robinzine Dep. 157:3-5). Arnony went to Robinzine's home on Christmas Eve in 2013, with Robinzine's wife and children present, to appear as Santa for Robinzine's children. (Arnony Dep. 48:2-24).

64. On April 5, 2014, after her interview in the burglary investigation, Rodriguez made allegations to Arnony that Robinzine was sleeping with her mother, Rubia Rodriguez. (Arnony Dep. 117:7-15, 118:4-10).

65. Arnony confronted Robinzine about Rodriguez's allegation that her mother, Rubia, was sleeping with Robinzine. Robinzine denied that allegation and told Arnony that he and Rubia were just friends. (Arnony Dep. 128:20-25, 129:1-8).

10

*No Evidence of a Conspiracy*

66. Robinzine never enlisted Arnony to engage in a conspiracy to have Plaintiffs arrested. (Robinzine Dep. 533:15-18). Robinzine never enlisted Arnony to help get rid of the Plaintiffs; nor discriminate against or harass Plaintiffs. (Robinzine Dep. 533:19-25; 534: 1-2).

*Vanessa Rodriguez's Loss of Employment*

67. From 2012 until February 2015, Rodriguez worked as a massage therapist for SOMA Chiropractic. (Rodriguez's Ans. to Int., Ex. 18, No. 3). She worked 30-35 hours per week at SOMA. (Rodriguez Dep. 68:12-14). She left SOMA because she felt like she could not concentrate on her patients' care. (Rodriguez Dep. 71:1-72:15). Rodriguez then worked at La Vida Massage until August 2015, working 25-30 hours per week, making $18 per hour plus tips; she was terminated after she called to tell her supervisor she would be late because her basement flooded. (Rodriguez Dep. 73:3-76:22). Vanessa claims that she lost $85,000 as a result of not working from 2015 to 2016 as a massage therapist and was hindered in "moving forward" in her career like she wanted to. (Rodriguez Dep. 83:7-18, 85:13-24). However, Vanessa did not disclose any documents that support his amount. She further did not disclose this amount in the damages section of the Rule 26 Disclosures. (Plaintiffs' Voluntary Rule 26 Disclosures p. 3, Ex. 19*)*.

*Manuel Camacho Loss of Employment*

68. Camacho was terminated from Beacon Fasteners on July 28, 2011 after failing to call or show for 3 days. (Beacon Fasteners Subp., Ex. 20). Camacho claims that it was due to his brother-in-law of his ex-wife working at the job. (Camacho Dep. 199:23-201:17). Not only do the employment records not support this – Camacho's divorce was filed in February of 2010 and made final in October of 2010. (*Petra v. Manuel Camacho* Court record, Ex. 21). Camacho has no record of any other employment from Beacon Fasteners until he began working for VeePak. (Camacho Dep. 201:10-18; Grier Subp. Ex. 22, COB.000964-.000965). Camacho then worked for VeePak from August 2013 to December 2015. At the time he left he was making $14.50 an hour. (Grier Subp. Ex. 22, COB.000964-.000965).

69. On March 21, 2016, Camacho was hired at Grier Abrasive making $13.75 an hour. (Grier Subp., Ex. 22; Camacho Dep. 208:4-5). He was given excused court appearances on April 6 and April 14, 2016. (Grier Subp., Ex. 22 – COB.000972-.000973). However, his appearance in court was only required on April 6, 2016. (Criminal Court Records, Ex. 15). Camacho got into a confrontation with another employee on April 13, 2016, walked of the job at 1:40 p.m. that day, and received a day's suspension on April 15, 2016. He also failed to show up for work on May 6, 9, 17, and 18 – none of these dates were court appearances. (*Compare* Grier Subp., Ex. 22 *with* Criminal Court

Records, Ex. 15). Camacho then voluntarily quit his job at Grier Abrasive on May 19, 2016. (Grier Subp., Ex. 22).

70. The only prospective employer that Camacho could identify as asking about his criminal history, was TruckPro, through Express Staffing. Camacho testified that he refused to explain the situation because it was "embarrassing." (Camacho Dep. 140:23-145:5). However, the employment records from TruckPro do not indicate any attempt at hiring Camacho personally. (TruckPro Subp. Ex. 23).

*Foreclosure and Other Financial Issues*

71. Camacho and Rodriguez claim that they suffered a loss of a Ford Fusion through repossession. However, the Fusion was not repossessed until July 2016. At the time that it was repossessed, they only owed $640.96 on the car and $350.00 in late charges. (Rodriguez 0156-0160, Ex. 24). Camacho and Rodriguez shared the payments on the Ford Fusion. (Rodriguez Dep. 88:1-8). They specifically claim that they suffered $12,000 by taking out a car loan to buy the Ford Fusion and $20,000 related to the loss of the vehicle. (Rodriguez Dep. 87:4-10; 88:17-89:17). However, this category of damages, any computation related to this category of damages, or any documents demonstrating these damages was not disclosed in their Voluntary Disclosures (Ex. 19, p. 3). Rodriguez later disclosed some documents related to the repossession, but none of these documents demonstrate that she or Camacho paid $12,000 to purchase the vehicle or that they suffered a loss of $20,000 in relation to these vehicles. (Rodriguez 0156-0160, Ex. 24). Rodriguez herself when asked in her deposition stated: "to be honest I don't know where the $20,000 came from." (Rodriguez Dep. 88:17-89:17). Instead, the documents disclosed that the car was repossessed and sold for $4900 and that Rodriguez was notified that there was still a deficiency of $3,791.98 based on the amount of the car loan she had taken out. (Rodriguez 0156-0157, Ex. 24). Rodriguez testified in her deposition that "her lawyer was handling that" with respect to the deficiency. (Rodriguez Dep. 89:8-11). This is not the first time that Camacho has had a car repossessed – he previously has had a Buick repossessed. (Camacho Dep. 27:24-28:12).

72. Camacho paid Delaney Law approximately $11,000 for his defense in the criminal matter arising out of his interaction with the Berwyn Police Department. (Camacho Dep. 368:7-16).

73. In addition to this matter and the criminal case, Delaney Law also represented Rodriguez and Camacho in a foreclosure action. (Appearance of Delaney Law, Ex. 25). Rodriguez claims that she lost $35,000 due to foreclosure, but has produced no documents that support this claim in response to specific discovery requests and did not disclose this category of damages, its computation, or any documents related to these damages in her Rule 26 Voluntary Disclosures. (Rodriguez

12

Dep. 86:18-87:3; Rodriguez Amended Response to Request to Produce No. 4; Ex. 26; Plaintiffs' Voluntary Disclosures p. 3 – Computation of Damages Listed, Ex. 19).

*Emotional Distress*

74. The purported $1.65 million in emotional damages claimed by Camacho and $1.85 million by Rodriguez represent figures their attorneys came up with. (Rodriguez Ans. to Int. No. 8; Camacho Ans. to Int., Ex. 27, No. 10; Camacho Dep. 217:18-218:10; Rodriguez Dep. 108:8-22).

75. Camacho claims that from 2015 to 2016 he would have 2-3 panic attacks every month, which would last 5-10 minutes. (Camacho Dep. 212:13-24). The panic attacks would occur when Camacho was around police officers (Camacho Dep. 212:2-12). He claims he took medicine once to address the alleged panic attacks. (Camacho Dep. 216:14-17). Similarly, Rodriguez claims she saw a physician approximately five times for her depression, and she claims she tried medication for about a week to address her depression but stopped after a week of taking the medication. (Rodriguez Dep. 102:1-104:7).

76. DeJesus generally alleges he suffers stress and anxiety. He claimed in his testimony that that made it difficult to concentrate in school. (DeJesus Dep. 119:17-20). DeJesus has never seen a doctor for his alleged stress and anxiety and has no plans to see a doctor. (DeJesus 123:21-124:4). He listens to music to relieve the alleged stress. (DeJesus 172:19-23). He further testified that this anxiety allegedly is not triggered or caused by anything in particular. (DeJesus 173:3-174:6).