UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VANESSA RODRIGUEZ, MANUEL CAMACHO, and DIMITRI DEJESUS, | ) ) | |
| | ) | 16 C 5106 |
| Plaintiffs, | ) ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) ) | |
| CITY OF BERWYN, KARLAS ROBINZINE, ROBERT ARNONY, TIMOTHY KESKE, and JIM RITZ, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Vanessa Rodriguez, Manuel Camacho, and Dimitri DeJesus bring this suit against the City of Berwyn, its former Chief of Police Jim Ritz, and Berwyn police officers Karlas Robinzine, Robert Arnony, and Timothy Keske, alleging 42 U.S.C. § 1983 and state law claims arising from an alleged campaign of harassment that culminated in Camacho's and Vanessa's arrests. Doc. 1. Defendants move for summary judgment. Docs. 109, 112, 115, 119. Robinzine's and Arnony's motions are granted, and Keske's motion and the City and Ritz's motion are granted in part and denied in part.

**Background**

**A.      Evidentiary and Local Rule 56.1 Issues**

Before setting forth the facts, the court addresses some preliminary evidentiary and Local Rule 56.1 issues.

First, Plaintiffs' Local Rule 56.1(b)(3)(C) statement of additional facts, Doc. 131, makes assertions that contradict facts they admitted in their Local Rule 56.1(b)(3)(B) response to Defendants' Local Rule 56.1(a)(3) statement, Doc. 130. *Compare, e.g.*, Doc. 130 at ¶ 49 *with*,

*e.g.*, Doc. 131 at ¶ 17. Because the only proper vehicle for disputing factual assertions in a Local Rule 56.1(a)(3) statement is a Local Rule 56.1(b)(3)(B) response, the court will hold Plaintiffs to their admissions and disregard their Local Rule 56.1(b)(3)(C) assertions to the extent those assertions conflict with their admissions. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to *clearly identify material facts in dispute* and provide the admissible evidence that tends to prove or disprove the proffered fact. A litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a *clear, concise, and obvious fashion, for quick reference of the court*. The district court did not abuse its discretion in finding Curtis failed to comply with Rule 56.1 requirements.") (emphasis added); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.") (internal quotation marks omitted); *cf. Olivet Baptist Church v. Church Mut. Ins. Co.*, 2016 WL 772787, at *1-2 (N.D. Ill. Feb. 29, 2016) (deeming admitted the facts asserted in the defendant's Local Rule 56.1(a)(3) statement where the plaintiff failed to file a Local Rule 56.1(b)(3)(B) response and instead attempted to treat its Local Rule 56.1(b)(3)(C) statement as a response to the Local Rule 56.1(a)(3) statement), *aff'd*, 672 F. App'x 607 (7th Cir. 2017).

Second, Plaintiffs' Local Rule 56.1(b)(3)(B) response at times states that Plaintiffs "neither confirm nor deny" an assertion in Defendants' Local Rule 56.1(a)(3) statement due to a lack of information. Doc. 130 at ¶¶ 13, 33. Because Plaintiffs cite nothing in the record to explain their lack of information, and thus their inability to confirm or deny the assertions, the

assertions are deemed admitted to the extent they are supported by the record materials cited by Defendants. *See* N.D. Ill. L.R. 56.1(b)(3)(B) (requiring, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon"); N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation."); *Curtis*, 807 F.3d at 218 ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (internal quotation marks omitted); *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011). To the extent Plaintiffs mean to object to the assertions on the ground that discovery was incomplete, the argument is forfeited; the discovery cutoff has long since passed, and Plaintiffs never moved under Civil Rule 56(d) to allow more time to take discovery before responding to the summary judgment motions. *See Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir. 1988) (holding that the plaintiff could not assert inadequate discovery as a basis for reversing summary judgment where he failed to ask the district court for more time to conduct discovery).

Third, Plaintiffs object to the affidavit of Sandro Scardamaglia, a Berwyn police officer, which Defendants cite to support ¶¶ 13, 16, 17 of their Local Rule 56.1(a)(3) statement. Doc. 130 at ¶¶ 13, 16, 17 (citing Doc. 108-6). Plaintiffs argue that the affidavit should be "excluded on the basis of hearsay, facts not in evidence, and evidence that was not disclosed in

discovery." *Id*. at 2. Those objections are meritless. The affidavit does not contain hearsay; it merely relates Scardamaglia's personal knowledge of percipient facts. Doc. 108-6. Nor does the affidavit rely on "facts not in evidence"; rather, it puts in evidence the facts cited by Defendants. Plaintiffs' complaint about evidence not being disclosed appears to be that "the employee files turned over in discovery were incomplete on this issue." Doc. 130 at ¶ 13. As noted, Plaintiffs forfeited any objection based on incomplete discovery by failing to move under Civil Rule 56(d) for more time to take discovery; in addition, Plaintiffs never moved to compel production of the employee files in question. *See Trask v. Rodriguez*, 854 F.3d 941, 944 (7th Cir. 2017) ("[The plaintiff] never asked the district court to compel disclosure, so she will not be heard to complain about [the court's] failure to do so."); *Davis*, 841 F.2d at 189. Accordingly, because ¶¶ 13, 16, 17 of Defendants' Local Rule 56.1(a)(3) statement are supported by the cited portions of the record and because Plaintiffs' objections are meritless, the assertions in those paragraphs are deemed admitted.

Fourth, Plaintiffs object to ¶ 27 of Defendants' Local Rule 56.1(a)(3) statement—which asserts, based on Robert Arnony's deposition testimony and a "premise watch" email he sent to other Berwyn police officers, that "Margarita Rodriguez requested [a] premise watch because she was the victim of a burglary that she believed had been committed by her daughter Vanessa [Rodriguez]" and because she "was afraid that Vanessa was going to come over and damage her property"—as resting on inadmissible hearsay because "Arnony is unable to testify as to why [Margarita] requested a premise watch." Doc. 130 at ¶ 27. Arnony's testimony is not hearsay because it is not offered for the truth of what Margarita told him—that she believed that Vanessa committed the burglary, that she was afraid of what Vanessa might do, and that she requested a premise watch for those reasons—but rather as evidence of why Arnony issued a premise watch.

*See United States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking[] at the time or what motivated him to do something."); *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay.").

Fifth, Plaintiffs object to ¶ 50 of Defendants' Local Rule 56.1(a)(3) statement—which asserts that "[Manuel] Camacho and [Vanessa] live about four or five blocks from the Berwyn police station and also live near a park where there is a significant amount of 'police activity'"—on the grounds that "it assumes facts not in evidence" and "is immaterial." Doc. 130 at ¶ 50. Because the assertion is supported by the cited record materials and is relevant to whether there is an innocent explanation for the police activity near Plaintiffs' home, it is deemed admitted.

Sixth, Plaintiffs object to ¶ 52 of Defendants' Local Rule 56.1(a)(3) statement—which asserts, based on Vanessa's deposition testimony, that she never personally "experienced any stalking outside [her] residence or on roadways," that she "was never pulled over," and that Camacho "was pulled over but never by any of the Defendants"—as "conclusory" and "lack[ing] foundation." *Id*. at ¶ 52. Because the assertion articulates specific facts rather than legal conclusions and is supported by cited deposition testimony, Plaintiffs' objection is overruled and ¶ 52 is deemed admitted. *See Harney v. City of Chicago*, 702 F.3d 916, 922 (7th Cir. 2012) ("In granting summary judgment, the court may consider any evidence that would be admissible at trial. The evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content.") (internal quotation marks omitted).

Seventh, Defendants object to ¶ 3 of Plaintiffs' Local Rule 56.1(b)(3)(C) statement—which cites Karlas Robinzine's text messages to Margarita to support Plaintiffs' assertion that

Robinzine thought that Vanessa stole personal items he kept in Margarita's safe—arguing that the underlying texts are inadmissible hearsay and are not authenticated as required by Evidence Rule 901. Doc. 138 at ¶ 3. Neither objection has merit. Robinzine's texts are non-hearsay because he is the party opponent of the parties (Plaintiffs) introducing his texts. *See* Fed. R. Evid. 801(d)(2)(A) (providing that a statement offered against an opposing party that "was made by the party in an individual or representative capacity" is not hearsay); *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) ("The text messages [the defendant] sent are his own statements and as such are excluded from the definition of hearsay by Rule 801(d)(2)(A).") (emphasis omitted). As to authentication, Robinzine's testimony acknowledging that he sent the texts, Doc. 108-5 at 427-434, is "sufficient to support a finding that the item is what [Plaintiffs] claim[] it is." Fed. R. Evid. 901(a); *see also* Fed. R. Evid. 901(b)(1) (allowing authentication through "[t]estimony that an item is what it is claimed to be"); *Lewisbey*, 843 F.3d at 658 ("Lewisbey's admission that the Facebook posts were his is enough for authentication … .").

Defendants object on similar grounds to ¶ 4 of Plaintiffs' Local Rule 56.1(b)(3)(C) statement, which cites Robinzine's deposition testimony about Margarita's texts to him to support Plaintiffs' assertion that she promised him "that once the Plaintiffs were out of the picture they would be able to work on getting together." Doc. 138 at ¶ 4. Margarita's texts are not hearsay because they are offered not for the truth of the matters asserted, but rather to show what Robinzine believed Margarita wanted him to do. *See Leonard-Allen*, 739 F.3d at 954; *Hanson*, 994 F.2d at 406. And Robinzine's testimony acknowledging that he received the texts from Margarita, Doc. 108-5 at 427-434, sufficiently authenticates them. *See* Fed. R. Evid. 901(a), (b)(1); *Lewisbey*, 843 F.3d at 658.

## B. Factual Background

The following facts are stated as favorably to Plaintiffs as permitted by the record and Local Rule 56.1. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

### 1. Investigation and Arrests

In February 2014, Margarita Rodriguez made a criminal complaint to the Berwyn Police Department alleging that Vanessa Rodriguez, her daughter, had burglarized her home. Doc. 130 at ¶ 21. Detective Robert Arnony was assigned by his supervisor, non-party Sergeant Ramon Ortiz, to the matter. *Id*. at ¶ 20. Arnony, who had not previously known Margarita, went to her home to investigate. *Id*. at ¶¶ 22, 24. Margarita told Arnony that in addition to the alleged burglary, Vanessa had forged Margarita's signature on documents filed with the Illinois Secretary of State purporting to transfer a vehicle title from Margarita to Vanessa. *Id*. at ¶ 25. Arnony referred that allegation to the Illinois Secretary of State Police. *Id*. at ¶ 26.

On March 1, 2014, Arnony emailed a "premise watch" to members of the Berwyn Police Department's patrol, detective, tactical, and juvenile divisions, stating that Margarita was "requesting a premise watch on her residence" because "[s]he was the victim of a burglary … [that] she believes to have been committed by her daughter Vanessa." Doc. 108-11; Doc. 130 at ¶ 27. Arnony's email stated that "there has been an on-going financial dispute between [Margarita] and her daughter" and that Margarita said that "she is afraid that Vanessa will come over and either harm her or damage her property." Doc. 108-11; Doc. 130 at ¶ 27.

In April 2014, Arnony interviewed Vanessa and Manuel Camacho, her romantic partner, neither of whom he had previously met, at the police station about the alleged burglary.

Doc. 130 at ¶ 28. Some two weeks later, Arnony closed the burglary investigation for lack of evidence. *Id*. at ¶ 29.

On July 25, 2014, Camacho and Vanessa went to Margarita's house to confront her about the forgery complaint she had made to Arnony. *Id*. at ¶ 30. An argument ensued, and Margarita ultimately called 911 to accuse Camacho of breaking her car mirrors. *Ibid*. Early the next morning, Berwyn police officers investigated the complaint but did not make any arrests. *Id*. at ¶ 31. Ortiz assigned the matter to Arnony. *Id*. at ¶ 20.

Arnony interviewed witnesses on both sides of the dispute and a neighbor. *Id*. at ¶ 32. Margarita told Arnony that she saw Camacho break the mirrors on her car. *Id*. at ¶ 33. Arnony indicated in an email that he had obtained a receipt for $413.74 in repairs to Margarita's car along with photographs of the damage. Doc. 138 at ¶ 7; Doc. 131-3. The email stated that Camacho should be "felony reviewed" for criminal damage to property and noted that Vanessa was suspected of assaulting Margarita. Doc. 138 at ¶ 7; Doc. 131-3.

On November 13, 2014, Arnony called Vanessa, informed her that the Berwyn Police Department was still pursuing charges, and "insisted" that she and Camacho come to the station for questioning. Doc. 130 at ¶ 34. Vanessa and Camacho never did so. *Ibid*. Vanessa felt intimidated by Arnony's call. *Id*. at ¶ 56.

On January 2, 2015, Arnony emailed a "premise watch" memo to the Berwyn Police Department's patrol, detective, tactical, and juvenile divisions, indicating that Margarita had "request[ed] a premise watch on her residence" because she feared retaliation from Camacho and Vanessa in light of the Illinois Secretary of State Police's ongoing forgery investigation. Doc. 108-14; Doc. 130 at ¶¶ 35-36. The memo continued: "Camacho is also wanted by this department pursuant to a Criminal Damage to Property complaint … . At this time there is not a

warrant for Camacho however probable cause does exist to detain Camacho for questioning in this matter." Doc. 108-14 (capitalization altered); Doc. 130 at ¶ 35.

Timothy Keske, a patrol officer, received Arnony's memo and was present when it was discussed during roll call on January 5, 2015. Doc. 130 at ¶¶ 11, 36. Keske interpreted the memo's statement that there was probable cause to detain Camacho as meaning that there was probable cause to arrest him. *Id*. at ¶ 40; Doc. 108-4 at 56-57. Coincidentally, Camacho called the Berwyn police later that day to report that the license plate had been removed from Vanessa's car, and Keske was dispatched to their home to investigate. Doc. 130 at ¶ 37. Keske did not communicate with anyone from the time he was dispatched to when he arrived at the home. *Ibid*.

Upon arriving, Keske knocked and Camacho opened the door. *Id*. at ¶ 38. Camacho told Keske that he wished to report a stolen license plate, and he stepped outside to show Keske the car. *Ibid*. Camacho explained that he and Vanessa had an issue with her mother (Margarita) and a pending fraud case with the Illinois Secretary of State. *Ibid*. Keske returned to his patrol car and Camacho went back inside the house. *Id*. at ¶ 39. Prompted by Camacho's story, Keske remembered from Arnony's premise watch memo that Camacho was wanted and that there might be probable cause to detain him, so he radioed dispatch to check Camacho's name in law enforcement databases. *Ibid*. The name check came back negative, but non-party Sergeant McDonnell informed Keske that Camacho was wanted. *Id*. at ¶ 41. Based on McDonnell's confirmation and Arnony's memo, Keske decided to arrest Camacho for criminal damage to property. *Ibid*. Keske did not speak with anyone other than dispatch and McDonnell from the time he first spoke with Camacho about Vanessa's car through the arrest. *Ibid*.

Keske approached Camacho's house along with non-party Officer Massuci, who responded to a backup request. *Id*. at ¶ 42. Camacho opened the door, and Keske told him that he was under arrest. *Ibid*. At that point, Camacho was standing at the threshold, holding the screen door open. *Ibid*.; Doc. 108-13 at 174-176. Camacho tried to close the door, but Keske stopped him from doing so. Doc. 130 at ¶ 42.

According to Camacho, Keske then forced open the door, tackled him, and pinned him to the floor "so fast that" Massuci "already had his knee on [Camacho's] leg." *Id*. at ¶¶ 43-44 (alteration in original) (quoting Doc. 108-13 at 176). Camacho collided with the wall on his way to the floor. Doc. 138 at ¶ 24; Doc. 108-4 at 60. Keske held Camacho to the floor with both knees on his chest, while Massuci held his knee on Camacho's leg. Doc. 130 at ¶ 44. Keske handcuffed Camacho, and other officers carried him out of the home and threw him face down into a police van. *Ibid*.; Doc. 138 at ¶ 23; Doc. 108-13 at 182-183. Keske never punched, kicked, or struck Camacho. Doc. 130 at ¶ 44.

When Keske opened the door to tackle Camacho, Vanessa was behind the door. *Id*. at ¶ 45. Vanessa "jumped over" Keske "while he was engaged with Camacho on the floor." *Ibid*. Keske then restrained Vanessa by the forearm and handcuffed her. *Ibid*. Vanessa did not tell Keske that her handcuffs were too tight, though she later asked other officers to loosen them. *Ibid*.; Doc. 138 at ¶ 25. (Plaintiffs deny ¶ 45 of Defendants' Local Rule 56.1(a)(3) statement, citing only ¶ 25 of their Local Rule 56.1(b)(3)(C) statement, which asserts that Vanessa "complained to officers that the cuffs were too tight and asked that they be loosened." Doc. 138 at ¶ 25. Defendants correctly note that the cited portions of the record contradict any implication that Vanessa complained to Keske about the handcuffs. *Ibid*.; *see* Doc. 108-12 at 135-136 (Vanessa testifying that she complained to "a different officer" after she was placed in a police

car but that she never complained to Keske). Because Defendants' assertion in ¶ 45 is supported by the cited portions of the record and is not controverted by the materials Plaintiffs cite in response, it is deemed admitted.) Keske did not strike Vanessa. Doc. 130 at ¶ 45.

Dimitri DeJesus was in Camacho and Vanessa's home at the time of their arrests and was taken with them to the police station, but he was neither arrested nor handcuffed. *Ibid*. Keske did not speak with him. *Id*. at ¶ 51.

On January 27, 2016, the judge in Camacho's criminal case found that there was probable cause for his arrest. *Id*. at ¶ 47. The criminal case was dismissed in August 2016. *Id*. at ¶ 48.

After her arrest, Vanessa's arms were sore and bruised. Doc. 138 at ¶ 26; Doc. 108-12 at 134. She has experienced lasting "range of motion problems" with her arm that she attributes to Keske's having "internally rotated" it too far. Doc. 138 at ¶ 29; Doc. 108-12 at 134. Camacho about twice per month feels a "little discomfort in [his] … lower back," which he attributes to Keske's weight being on him during his arrest. Doc. 138 at ¶¶ 27-28; Doc. 108-13 at 250-251. Camacho also experiences shoulder pain once per week that he attributes to how he was carried out of the house. Doc. 138 at ¶ 27; Doc. 108-13 at 249-250.

## 2. Alleged Campaign of Harassment

Plaintiffs claim that from the start of the burglary investigation in February 2014 until Camacho's and Vanessa's arrests on January 5, 2015, Defendants waged a "campaign of harassment, oppression, and discrimination" against them. Doc. 130 at ¶ 62 (Plaintiffs admitting this assertion: "Ultimately, the purported campaign of harassment, oppression, and discrimination only lasted from the time the Berwyn Police Department initiated the burglary investigation until Plaintiffs' arrest on January 5, 2015."). During that time, Camacho and Vanessa received eight or nine parking tickets—including street cleaning tickets on days when

there was no street cleaning, and a parking ticket for running a stop sign at a time when Camacho was not in the car—all but one of which were dismissed. *Id*. at ¶ 49; Doc. 138 at ¶ 18; Doc. 108-13 at 194, 272-273. Additionally, Vanessa saw police cars drive past her home—which is located four or five blocks from the Berwyn police station and near a park with significant "police activity"—and Camacho saw a squad car parked at the end of their block, about nine or ten houses away. Doc. 130 at ¶¶ 50, 54. DeJesus saw the police car parked there once or twice per week for one or two months. *Id*. at ¶ 57. Plaintiffs have also seen police cars circling a park they frequent, and an officer once stopped them "very early in the morning" to say that they should not be there so early. *Id*. at ¶ 53; Doc. 138 at ¶ 16.

Vanessa never experienced any stalking outside her home and was never pulled over. Doc. 130 at ¶ 52. Defendants never pulled Camacho over. *Ibid*. Neither Camacho nor Vanessa ever mentioned to DeJesus that they felt the police were following them. *Id*. at ¶ 57.

As noted, Keske had not interacted with Camacho or Vanessa before January 5, 2015, the day of the arrest, and he has not spoken to them since then. *Id*. at ¶ 51. Keske did, however, wave at them when they appeared in court for their criminal cases. *Id*. at ¶ 55. Arnony gave Camacho and Vanessa dirty looks in court. *Ibid*. Camacho has seen Keske drive past Plaintiffs' house at least twice, and Keske once followed him home. Doc. 138 at ¶ 19; Doc. 108-13 at 226-227, 260.

Throughout the pertinent timeframe, Margarita and Karlas Robinzine, a detective in the Berwyn Police Department's juvenile division, were having an extramarital affair. Doc. 130 at ¶¶ 12, 63. At some point, Margarita sent Robinzine a text message suggesting that once Camacho and Vanessa were "out of the picture," Margarita and Robinzine could "work on …

getting together." Doc. 131-2 at 1; Doc. 108-5 at 434-439; Doc. 138 at ¶ 4. Robinzine believed that Vanessa stole personal items that he kept in Margarita's safe. Doc. 138 at ¶ 3.

Nobody in the Berwyn Police Department knew about Robinzine's affair with Margarita. Doc. 130 at ¶ 63. During her interview with Arnony in April 2014, Vanessa claimed that Robinzine was sleeping with Margarita. *Id*. at ¶ 64. When Arnony confronted Robinzine, Robinzine denied the affair, saying that he and Margarita were "just friends." *Id*. at ¶ 65.

Robinzine did not enlist Arnony to arrest, discriminate against, harass, or otherwise "help get rid of" Camacho or Vanessa. *Id*. at ¶ 66. (Plaintiffs deny this assertion, arguing that "[t]his is an issue of fact for the jury to decide as the jury will be best able to determine matters of credibility" and that the "surrounding facts and circumstances highly call [Defendants' assertion] into question," citing for support Arnony's deposition testimony that he does not recall the contents of texts he exchanged with Robinzine. *Ibid*. Arnony's testimony does not contradict Robinzine's testimony that Robinzine did not enlist Arnony to mistreat Camacho or Vanessa, so the assertion is deemed admitted.) Nor did Robinzine direct Keske to arrest Camacho or Vanessa. *Id*. at ¶ 37. Plaintiffs assert that Robinzine "injected himself into the criminal investigation involving damages to [Margarita's] property," but this assertion is not supported by the cited materials. Doc. 138 at ¶ 5; Doc. 108-5 at 436-443 (Robinzine testifying at his deposition about texts he exchanged with Margarita, which do not address the investigation).

Robinzine once called Vanessa and said: "I am calling on behalf of your mom, letting you know that she's filing a burglary charge against you. You know what you did, so why don't you just go to the police station and we can figure this out." Doc. 130 at ¶ 56. Vanessa found the call intimidating. *Ibid*. Robinzine did not make any other calls to Vanessa about the alleged burglary. *Id*. at ¶ 61. At some point in 2014, Robinzine photographed Vanessa's car. *Id*. at ¶ 54.

Robinzine once told Camacho to "stay out of trouble young man" and that "this is what you can get when you mess with the police or when you mess with someone." *Id*. at ¶ 60.

DeJesus knows of Robinzine only through this lawsuit. *Id*. at ¶ 58. Robinzine never stopped, harassed, or arrested DeJesus. *Ibid*. DeJesus has never received a citation from the Berwyn police, nor have the Berwyn police stopped him or talked to him other than on January 5, 2015. *Ibid*. DeJesus has never been arrested without a warrant, had a false report filed against him, or had litigation brought against him by the Berwyn police. *Ibid*.

### 3.    Supervision and Training

Plaintiffs did not know Jim Ritz, the Chief of Police, and have never spoken with him. *Id*. at ¶ 59. Ritz was unaware of Plaintiffs' allegations "until the lawsuit was made known to the media." *Ibid*. (Plaintiffs deny this fact, but do not cite any record evidence in support, arguing instead that "[t]his is an issue of fact for the jury to decide as the jury will be best able to determine matters of credibility." *Ibid*. Because this fact is supported by the materials cited by Defendants, it is deemed admitted.)

The City requires its police officers to attend a state-certified police academy, which covers topics such as probable cause, arresting and detaining suspects, and use of force. *Id*. at ¶ 13. The City supplements the academy training with a mandatory three-month field training program, in which officers are assigned to a senior officer during their shift. *Ibid*. The field training is meant to reinforce the material taught at the academy and to teach Berwyn Police Department policies and procedures. *Ibid*.

Additionally, all officers must attend a weeklong training program each year to complete mandatory recertifications and learn about new or revised policies. *Id*. at ¶ 14. The annual training frequently addresses the use of force. *Ibid*. The Berwyn Police Department also

provides ongoing training on its policies and procedures, which all officers are expected to know, "on an as-needed basis." *Id*. at ¶ 15. Officers receive ongoing training from third-party providers based on their "interests and focus within the police department." *Id*. at ¶ 17.

### 4. Damages

Aside from their physical and emotional injuries, Camacho and Vanessa claim that they lost employment opportunities, that their car was repossessed, and that their home went into foreclosure, though the foreclosure case was ultimately dismissed. *Id*. at ¶¶ 67, 71, 73; Doc. 138 at ¶ 33.

## Discussion

Plaintiffs filed this suit on May 10, 2016. Doc. 1. The complaint asserts state law and § 1983 claims against Arnony, Keske, and Robinzine based on the alleged campaign of harassment and discrimination; § 1983 claims against Keske based on the January 5, 2015 arrests, home entry, and use of force; a § 1983 claim against Ritz seeking to hold him liable as Arnony, Keske, and Robinzine's supervisor; and *Monell* and state law indemnification claims against the City. *Ibid*.

## I. Federal Claims Against Keske Arising from His Actions on January 5, 2015

### A. Section 1983 False Arrest Claims

Plaintiffs bring Fourth Amendment false arrest claims against Keske based on the arrests of January 5, 2015. Doc. 1 at ¶¶ 82-87. "A claim of false arrest is an allegation that a plaintiff was arrested without probable cause, in violation of the Fourth Amendment. Probable cause is an absolute defense to such a claim." *Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018) (citation omitted).

"Probable cause exists at the time of an arrest if the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing that the suspect has committed, is committing, or is about to commit an offense." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (alterations and internal quotation marks omitted). Probable cause "is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances," *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (internal quotation marks omitted), and "is gauged from the vantage point of a reasonable officer facing the same situation," *Ewell*, 853 F.3d at 919. "Probable cause does not require an actual showing of criminal activity, or even that the existence of criminal activity is more likely true than not; instead, probable cause merely requires that a probability or substantial chance of criminal activity exists." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (internal quotation marks omitted). "Even if, in hindsight, it appears that probable cause was lacking, qualified immunity is still available if the arresting officers reasonably could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed. This is often called arguable probable cause." *Hurt*, 880 F.3d at 841 (alterations, citation, and internal quotation marks omitted).

### 1. Camacho

Keske argues that he had probable cause under the collective knowledge doctrine to arrest Camacho for felony criminal damage to property. Doc. 110 at 3-5. Under the collective knowledge doctrine, "so long as the facts and circumstances within an agency's collective knowledge warrant a prudent person in believing that the suspect had committed or was committing an offense, an officer of that agency, acting in good-faith reliance on such facts and circumstances, has probable cause to effectuate an arrest." *Tangwall v. Stuckey*, 135 F.3d 510,

517 (7th Cir. 1998) (alterations, citation, and internal quotation marks omitted); *see also United States v. Hensley*, 469 U.S. 221, 232-33 (1985) (holding that a *Terry* stop made "in objective reliance on a flyer or bulletin" is lawful "if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department") (citation omitted); *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010) ("There is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest—or the collective knowledge of the agency for which he works—is sufficient to constitute probable cause.").

When he decided to arrest Camacho, Keske (1) had seen Arnony's January 2, 2015 premise watch memo stating that Camacho was "wanted by [the Berwyn Police Department] pursuant to a Criminal Damage to Property complaint" and that "probable cause does exist to detain Camacho for questioning in this matter," Doc. 108-14 (capitalization altered); and (2) had just received confirmation from McDonnell that Camacho was wanted, Doc. 130 at ¶ 41. Although Arnony's memo could be read to suggest that Camacho was merely "wanted for questioning and investigation" in the form of a *Terry* stop rather than an arrest, the memo's reference to "probable cause," and McDonnell's confirmation that Camacho was wanted, "would lead an experienced officer to conclude" that the Berwyn police had probable cause to arrest Camacho. *Hensley*, 469 U.S. at 234.

Even if the better interpretation of Arnony's memo and McDonnell's confirmation was that there was only reasonable suspicion to briefly detain Camacho, the arrest would not violate the Fourth Amendment so long as the Berwyn police in fact had probable cause to arrest him. *See United States v. Hayden*, 353 F. App'x 55, 56-58 (7th Cir. 2009) (holding that an arrest was

valid under the collective knowledge doctrine where the officer who had probable cause asked the arresting officer "to find [the suspect] so he could be questioned," reasoning that "knowledge of [the facts establishing probable cause] could be imputed to" the arresting officers by virtue of the "communication within the department about locating" the suspect); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) (applying the collective knowledge doctrine where the arresting officer was in communication with an officer who had probable cause, even though it was unclear from the record what the officer with probable cause told the arresting officer); *cf. Cook v. O'Neill*, 803 F.3d 296, 300-01 (7th Cir. 2015) (holding that an arrest was valid where there was in fact a warrant for the suspect's arrest, even though the arresting officers did not know about the warrant). This is significant, for the Berwyn police—Arnony in particular—had probable cause to arrest Camacho for felony criminal damage to property. At all relevant times, Illinois law made it illegal to "knowingly damage[] any property of another" and classified the offense as a felony if the damage exceeded $300. 720 ILCS 5/21-1(a)(1), (d)(1)(F) (2014) (amended 2017). Margarita told Arnony on September 1, 2014 that she saw Camacho break her car mirrors. Doc. 130 at ¶ 33. Arnony obtained photos of the damage and a receipt for the repairs, which cost $413.74. Doc. 138 at ¶ 7; Doc. 131-3. "[O]nce a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 716 (7th Cir. 2013) (internal quotation marks omitted); *see also Sow v. Fortville Police Dep't*, 636 F.3d 293, 302 (7th Cir. 2011) ("When an officer receives information from a third party whom it seems reasonable to believe is telling the truth, the officer has probable cause to effectuate an arrest."); *Hayden*, 353 F. App'x at 58 ("[The victim] was reasonably credible in informing the police that [the suspect] had committed the crime, and [the detective] therefore had probable cause to arrest him; that

probable cause was then imputed to the arresting officers."). Thus, Margarita's eyewitness report, along with the receipt and photos, gave Arnony probable cause to believe that Camacho had committed a felony. And because Arnony's knowledge is imputed to Keske under the collective knowledge doctrine, Keske's arrest of Camacho was supported by probable cause and thus did not violate the Fourth Amendment.

Because Keske had probable cause to arrest Camacho for felony criminal damage to property, it is unnecessary for purposes of the false arrest claim to determine whether he also had probable cause to arrest Camacho for resisting or obstructing a peace officer. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause.").

### 2. Vanessa

Keske argues that he had probable cause to arrest Vanessa for resisting or obstructing a peace officer in violation of 720 ILCS 5/31-1. Doc. 110 at 6-7. Keske maintains that Vanessa obstructed his arrest of Camacho by jumping over him while he was "on the ground engaged in physically detaining a criminal suspect." *Ibid*. Plaintiffs' brief does not address whether probable cause supported Vanessa's arrest, thus forfeiting the point and her false arrest claim. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Nextel specifically requested summary judgment on the quantum meruit claim. Keck Garrett, however, did not defend that claim in its reply to Nextel's motion for summary judgment. By failing to present its argument to the district court, Keck Garrett

abandoned its claim."); *Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [an argument] in his brief opposing summary judgment, [the plaintiff] lost the opportunity to urge it in both the district court and this court."), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

### 3. DeJesus

As Keske correctly argues, Doc. 110 at 7, he is entitled to summary judgment on DeJesus's false arrest claim because DeJesus was never arrested, Doc. 130 at ¶ 45. *See Hurt*, 880 F.3d at 841 (noting that a false arrest plaintiff must prove that he "was arrested without probable cause").

### B. Section 1983 Unlawful Entry Claim

Plaintiffs allege that Keske's entry into their home on January 5, 2015 was unlawful under the Fourth Amendment. Doc. 1 at ¶¶ 76-81. Keske argues that because he was in hot pursuit of Camacho after initiating an arrest while Camacho was standing at the home's threshold with the door open, his entry into the home did not violate the Fourth Amendment. Doc. 110 at 7-8. Keske argues in the alternative that even if he violated the Fourth Amendment, he is entitled to qualified immunity because it was not clearly established at the time that the entry was unlawful. *Id*. at 10-11. Rather than decide whether the entry violated the Fourth Amendment, the court will exercise its discretion to address whether Keske is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014).

To overcome qualified immunity, Plaintiffs must demonstrate that the Fourth Amendment right in question "was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (brackets and internal

quotation marks omitted).  To satisfy this standard, the right must have been clearly established "in a particularized sense, rather than at a high level of generality."  *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks omitted).  This means that "[t]he official must have [had] 'fair warning' that his conduct [was] unconstitutional."  *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

Keske did not have fair warning that his entry into Camacho and Vanessa's home was unconstitutional under the circumstances presented.  A reasonable police officer in Keske's situation could have believed that he initiated Camacho's arrest in a public place; that Camacho's attempt to close the door and retreat inside provided probable cause to arrest him for misdemeanor resisting or obstructing; and that the resulting hot pursuit entitled Keske to enter the home to complete the arrest.  As explained in Section I.A.1, *supra*, Keske had probable cause to arrest Camacho for felony criminal damage to property.  Viewing the record in the light most favorable to Plaintiffs, Keske told Camacho that he was under arrest while Camacho was standing at the threshold of the home, holding the screen door open.  Doc. 130 at ¶ 42; Doc. 108-13 at 174-176.  At that point, a reasonable officer could have believed that Camacho was in a public place and could therefore be arrested upon probable cause without a warrant.  *See United States v. Santana*, 427 U.S. 38, 40-42 & n.1 (1976) (holding that a suspect standing in the open doorway of her house, such that "one step forward would have put her outside" and "one step backward would have put her in the vestibule," was in a public place because she "was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house"); *United States v. Berkowitz*, 927 F.2d 1376, 1388 (7th Cir. 1991) ("As far as

reasonable privacy expectations go, there is a significant difference between a person who for no reason voluntarily decides to stand in his open doorway, and a person who merely answers a knock on his door. The person who answers the knock and stays within the house is not voluntarily exposing himself to [the] public … .") (internal quotation marks omitted).

What happened from there is governed by the muddied law of "doorway arrest[s]." *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 690-91 (7th Cir. 2001) (holding that the defendant officer violated the Fourth Amendment by entering the plaintiff's home to complete an arrest initiated while the plaintiff was standing behind his closed screen door, but that the defendant was entitled to qualified immunity because "the law surrounding Fourth Amendment 'doorway arrest' questions … was not sufficiently settled or defined at the time of the arrest"). The parties agree that Keske could have lawfully pursued Camacho into his home if Keske initiated the arrest in a public place and the circumstances qualified as "hot pursuit." Doc. 110 at 7-8; Doc. 129 at 11-12, 28-29; *see Santana*, 427 U.S. at 42-43 (holding that where the police were in hot pursuit of a felony suspect and there was "a realistic expectation that any delay would result in destruction of evidence," the suspect could not "defeat an arrest which ha[d] been set in motion in a public place … by the expedient of escaping to a private place"). The parties disagree from there. Keske contends that once Camacho tried to thwart his imminent arrest by closing the door and retreating inside, hot pursuit commenced. Doc. 110 at 7-8. Plaintiffs respond that Keske could not have been in hot pursuit of Camacho for any charge because: (1) the alleged felony criminal damage to property had occurred months earlier; and (2) Keske lacked probable cause to arrest Camacho for misdemeanor resisting or obstructing arrest because, without probable cause on the criminal damage to property charge, the arrest was an unauthorized act that Camacho was entitled to obstruct. Doc. 129 at 12.

Plaintiffs' response is unpersuasive. As noted, Keske had probable cause to arrest Camacho for felony criminal damage to property. And even if he did not, Camacho's attempt to thwart the arrest provided arguable probable cause to arrest him for resisting or obstructing arrest. Under Illinois law, "[a] person who knowingly resists or obstructs the performance by one known to the person to be a peace officer … of any authorized act within his or her official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a). Because Keske was attempting to arrest Camacho for felony criminal damage to property, he was engaged in an "authorized act" even if that arrest was not authorized by probable cause. *See City of Champaign v. Torres*, 824 N.E.2d 624, 629 (Ill. 2005) ("[A]n arrest made by a peace officer is an 'authorized act' even if the arrest is unlawful."); *see also Chelios v. Heavener*, 520 F.3d 678, 688 (7th Cir. 2008) (same, applying Illinois law). Accordingly, because Keske "reasonably could have believed" that Camacho's response to his imminent arrest—attempting to close the door and flee inside— amounted to misdemeanor resisting or obstructing, he had arguable probable cause to arrest Camacho on that new offense. *Hurt*, 880 F.3d at 841 (alterations and internal quotation marks omitted).

True enough, Illinois law is unclear concerning whether a suspect who refuses entry to his home after a police officer initiates an arrest in public, but who does not use physical force against the officer's person, commits resistance or obstruction. *See People v. Villareal*, 604 N.E.2d 923, 924-25, 927 (Ill. 1992) (holding that the defendants could be convicted of resisting or obstructing where the officer attempted to enter a home to pursue a suspect and the defendants "resisted, telling [the officer] that he needed a warrant," and "[a] physical confrontation between the defendants and the officers ensued at the front door"); *People v. Hagler*, 937 N.E.2d 204, 210 (Ill. App. 2010) (suggesting that "the simple act of running away when told to stop … would

support a conviction" for misdemeanor resisting or obstructing); *People v. Hilgenberg*, 585 N.E.2d 180, 182, 186 (Ill. App. 1991) (affirming the dismissal of resisting or obstructing charges because, "[a]bsent specific factual allegations that the officer was acting on the basis of a warrant, consent, or probable cause to arrest coupled with exigent circumstances," the defendants had a Fourth Amendment right to refuse to open the door to their home, and suggesting in dicta that the resisting or obstructing statute is limited by "the right to shut the door on the officers of the State unless their entry is under the proper authority of law"). But because the uncertainty surrounding this legal issue could have led a reasonable officer to believe that Camacho's conduct amounted to resistance or obstruction, Keske's probable cause determination is shielded by qualified immunity. *See Zimmerman v. Doran*, 807 F.3d 178, 184 (7th Cir. 2015) ("Because Zimmerman has not identified clearly established law that would alert the officers that a person on land pursuant to a timber deed cannot commit trespass, the district court did not err in granting summary judgment to the defendants [on a false arrest claim] on the ground of qualified immunity."); *Gibbs v. Lomas*, 755 F.3d 529, 539-42 (7th Cir. 2014) (holding that the defendant was entitled to qualified immunity on a false arrest claim "in light of the undeveloped case law regarding" whether the suspect's conduct violated a state statute).

In so holding, the court acknowledges that existing Fourth Amendment precedent does not clearly resolve whether pursuing a suspect from the site of misdemeanor resistance into his home counts as a hot pursuit of the sort that justifies entering the suspect's home without a warrant, particularly when the resistance occurs at the home's threshold. *See Stanton v. Sims*, 571 U.S. 3, 4-6, 10 (2013) (holding that there was no clearly established violation of the Fourth Amendment where the officer ordered a suspicious person to stop; the suspect fled, providing probable cause to believe he had committed a misdemeanor by disobeying the officer's order;

and the officer pursued the suspect into a third party's gated yard); *Santana*, 427 U.S. at 42-43

("The fact that the pursuit here ended almost as soon as it began did not render it any the less a

'hot pursuit' sufficient to justify the warrantless entry into Santana's house."); *Burns v. Vill. of

Crestwood*, 2016 WL 946654, at *7-9 (N.D. Ill. Mar. 14, 2016) (holding that it was not clearly

established by August 2010 that officers unlawfully entered a suspect's home where the officers

had probable cause to arrest the suspect for an alleged theft that had occurred weeks earlier; the

officers initiated the arrest on the suspect's porch; and the suspect pushed an officer's arm away,

stepped back into his home, and attempted to close the door, thus placing the officers in hot

pursuit of the suspect for misdemeanor resisting arrest). But again, the fact that the question

remains unresolved works in Keske's favor. Because existing precedent has not placed this

question "beyond debate," *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks

omitted), Keske is entitled to qualified immunity on Plaintiffs' unlawful entry claim.

### C.     Section 1983 Excessive Force Claims

Plaintiffs bring Fourth Amendment excessive force claims against Keske based on his

conduct during the January 5, 2015 arrests. Doc. 1 at ¶¶ 88-91. Keske argues that he used only

the force necessary to arrest Camacho, only *de minimis* force against Vanessa, and no force at all

against DeJesus. Doc. 110 at 8-9. In the alternative, Keske argues that he is entitled to qualified

immunity. *Id*. at 10-11.

### 1.     Camacho

Camacho alleges that he was subjected to excessive force when he was tackled, pinned to

the floor by Keske's and Massuci's knees, handcuffed, carried out of the house by his shoulders

and feet, and thrown face down into a police van. Doc. 129 at 18-19. The last two aspects of the

force used against Camacho—being carried out of the house and thrown face down into the

van—are easily disposed of. Keske indisputably did not take part in those uses of force, Doc. 130 at ¶ 44; Doc. 138 at ¶ 23, and Plaintiffs do not argue that Keske can be held liable for what the other officers did, thus forfeiting the issue. *See Nichols*, 755 F.3d at 600; *Keck Garrett*, 517 F.3d at 487; *Witte*, 434 F.3d at 1038. That leaves the uses of force attributable to Keske: tackling Camacho; pinning him to the floor with both knees; and handcuffing him.

"Excessive force claims are reviewed under the Fourth Amendment's objective reasonableness standard," which considers "the perspective of a reasonable officer under the circumstances, rather than … in hindsight." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). "A police officer's use of force is unconstitutional if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (internal quotation marks omitted). "In determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment," the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interest alleged to justify the intrusion." *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472 (7th Cir. 2015). In so doing, the

> court addresses several factors to determine the reasonableness of an officer's actions under the circumstances, including the severity of the crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties.

*Dawson*, 803 F.3d at 833. When an individual is resisting arrest, an officer may use the amount of force necessary to overcome his resistance. *See Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) ("An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest … ."); *Estate of Phillips v. City*

*of Milwaukee*, 123 F.3d 586, 592-93 (7th Cir. 1997) (holding that it was reasonable to restrain a suspect in a prone position where his violent resistance created a "need to incapacitate him and to protect the safety of the officers and other witnesses").

The Seventh Circuit has cautioned that "summary judgment is often inappropriate in excessive force cases" because "the parties typically tell different stories about what happened," *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009), and because "evidence surrounding the officer's use of force is often susceptible to different interpretations," *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). That said, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011) (internal quotation marks omitted).

As to the handcuffing, nothing in the record suggests that Keske used any more force than necessary when placing handcuffs on Camacho, that the handcuffs were too tight, or that it was unreasonable to handcuff him in the first place. It follows that Keske deserves summary judgment on the handcuffing aspect of Camacho's excessive force claim. *See Williams v. Brooks*, 809 F.3d 936, 945 (7th Cir. 2016) ("Since Officer Brooks had probable cause to stop and arrest Williams, he could handcuff Williams without violating the Fourth Amendment."); *Stainback*, 569 F.3d at 772-73 (holding that officers did not use excessive force in handcuffing a suspect, even though the suspect "said that he did not want to be handcuffed because he thought it would hurt" and "complained generally about pain after he was handcuffed").

As to the tackling, the court will exercise its discretion to pass on the question whether the tackling violated the Fourth Amendment and address only whether Keske deserves qualified immunity. *See Pearson*, 555 U.S. at 236; *Mordi*, 770 F.3d at 1165. As noted, at the time Keske

tackled him, Camacho was attempting to close the door on Keske and retreat inside. Under those circumstances, Keske was entitled to use appropriate force to subdue Camacho and effectuate the arrest. *See Stainback*, 569 F.3d at 772 (noting that officers may use "some degree of physical force or threat of force to effectuate" a lawful arrest). Plaintiffs have not shown that "existing precedent" in January 2015 had "placed the … constitutional question" whether tackling a suspect under those or comparably serious circumstances was permissible "beyond debate." *White*, 137 S. Ct. at 551 (internal quotation marks omitted). Keske therefore was not on reasonable notice that tackling Camacho under those circumstances violated the Fourth Amendment. *See Dawson*, 803 F.3d at 834 (affirming summary judgment and holding that an officer "could reasonably believe it was necessary to tackle" a 72-year-old man who was nonviolently interfering with his son's arrest); *Findlay v. Lendermon*, 722 F.3d 895, 898-900 (7th Cir. 2013) (holding that an officer who tackled a nonviolent suspect was entitled to qualified immunity on an excessive force claim); *Boothe v. Sherman*, 190 F. Supp. 3d 788, 799-800 (N.D. Ill. 2016) (holding that an officer was entitled to qualified immunity as to his "straight-arm takedown" of a resisting high school student). At most, Keske's tackling of Camacho lies "in the hazy border between excessive and acceptable force," *Mullenix*, 136 S. Ct. at 312 (internal quotation marks omitted), and thus is protected by qualified immunity.

That leaves the question whether Keske used excessive force by pinning Camacho to the ground with both knees pressed into his chest. The court is mindful that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (alteration omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Still, a reasonable jury could find that this particular aspect of the force Keske used was objectively unreasonable. The

summary judgment record does not definitively say whether Camacho continued to resist after Keske tackled him and, if so, whether the extent of his resistance made it reasonable for Keske to press both knees into his chest when another officer already had a knee on his leg. *See Cyrus*, 624 F.3d at 862-63 (reversing the district court's grant of summary judgment due to conflicting evidence "on the extent to which [the plaintiff] resisted arrest," reasoning that the plaintiff's initial resistance did not necessarily justify the officer's continued use of force because, "as the threat changes, so too should the degree of force"). Viewing the facts in the light most favorable to Camacho and applying the pertinent factors, *see Dawson*, 803 F.3d at 833, the force Keske applied was constitutionally excessive: Camacho's alleged crimes (breaking the mirrors on a car, and then resisting arrest by retreating inside his home) were not severe; he posed little threat to Keske or others; he was unarmed; and once he was on the floor, there is no indication that he continued to attempt to interfere with Keske's duties. It follows that a genuine dispute exists as to whether, once Camacho was on the floor, Keske used "greater force than was reasonably necessary to make the arrest." *Becker*, 821 F.3d at 925 (internal quotation marks omitted); *see also Cyrus*, 624 F.3d at 863 ("[A] jury might reasonably conclude that the circumstances of the encounter here reduced the need for force as the situation progressed. … [O]nce [the plaintiff] was on the ground, unarmed, and apparently unable to stand up on his own, the risk calculus changed."); *Boothe*, 190 F. Supp. 3d at 797-99 (holding that an officer who, after the suspect stopped resisting and was on the ground, "proceeded to dig his knee into her back and hold her neck for over a minute" was not entitled to qualified immunity); *Edwards v. Vill. of Schaumburg*, 2014 WL 5293420, at *4 (N.D. Ill. Oct. 16, 2014) (rejecting qualified immunity where, when the plaintiff was already handcuffed and was not resisting, the officer slammed him to the ground and restrained him face-down).

The cases Keske cites—*Padula v. Leimbach*, *supra*, *Catlin v. City of Wheaton*, *supra*, and *Estate of Phillips v. City of Milwaukee*, *supra*—are distinguishable because the officers in all three cases applied force while the suspect was continuing to resist. *See Padula*, 656 F.3d at 604 (holding that it was reasonable for an officer to put his knee on the suspect's head "at some point *during the scuffle* … to prevent [the suspect] from continuing to hit his head against the pavement" where there was "no indication that the officer applied excessive pressure with his knee or that his knee injured [the suspect] in any way") (emphasis added); *Catlin*, 574 F.3d at 367 (holding that it was reasonable for an arresting officer to "forcibly plac[e] his knee" on the suspect's back while another officer handcuffed him "[i]n light of the fact that [the suspect] admitted that he *'struggled really, really hard' and managed temporarily to break free*") (emphasis added); *Estate of Phillips*, 123 F.3d at 593 ("We hold that these actions of the officers amount to an objectively reasonable response to *the escalating situation they faced*. … Restraining a person in a prone position is not, in and of itself, excessive force *when the person restrained is resisting arrest*.") (emphasis added). Those cases thus stand for the proposition that an officer may use the force necessary to overcome an arrestee's resistance. Here, the record would permit a reasonable jury to find that there was no resistance left to overcome at the time Keske pinned Camacho to the ground with both knees.

Because a reasonable jury could find that Keske violated the Fourth Amendment with respect to force he applied after tackling Camacho, Camacho has met his "burden of establishing that his … rights were violated." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). The next question is whether Keske is entitled to qualified immunity. He is not. By January 2015, it had long been settled "that police officers [may] not use significant force on nonresisting or passively resisting suspects" and that "police officers cannot continue to use force once a suspect

is subdued." *Abbott*, 705 F.3d at 732 (collecting cases to support the proposition that those Fourth Amendment principles were "well-established" by 2007); *see also Becker*, 821 F.3d at 928 (same, by 2011); *Alicea*, 815 F.3d at 292 (same). Viewing the record in the light most favorable to Camacho, Keske continued to apply substantial force once Camacho was on the ground and subdued. Because precedent made clear that it would have been "objectively unreasonable for [Keske] to believe that the force" he used at that point "was lawful," *Estate of Williams*, 797 F.3d at 473 (internal quotation marks omitted), he is not entitled to qualified immunity. *See Boothe*, 190 F. Supp. 3d at 798-99 (holding that it was objectively unreasonable for the officer to believe that continuing to apply substantial force once the suspect was on the ground and no longer resisting was lawful); *see also Strand v. Minchuk*, __ F.3d __, 2018 WL 5834371, at *5-7 (7th Cir. Nov. 8, 2018) (affirming the district court's rejection of qualified immunity because the summary judgment "record left unclear precisely how much time went by from the moment the fist fight stopped" and the plaintiff stepped back and surrendered "to the moment [the officer] pulled the trigger," reasoning that "[a]t some point, … enough time may have passed that it would have been objectively unreasonable for" the officer to believe that the force he used was reasonable).

Summary judgment is therefore granted on Camacho's excessive force claim except as to Keske's pinning Camacho to the ground with both knees after tackling and subduing him.

### 2. Vanessa

Vanessa alleges that Keske applied excessive force by over-tightening her handcuffs and by rotating her arm in such a way as to cause recurring range of motion problems. Doc. 129 at 19-20. Keske responds that his grabbing Vanessa's arm and handcuffing her was only "*de*

*minimis*" force and that Vanessa never complained to him that the handcuffs were too tight. Doc. 110 at 9; Doc. 137 at 11-12.

As to the handcuffing, Keske did not use excessive force. "A person has the right to be free from an officer's *knowing* use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury." *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (emphasis added). "[A] reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known to him." *Stainback*, 569 F.3d at 773. Thus, absent evidence that Keske used the handcuffs "in a manner that would clearly injure or harm a typical arrestee" or that it was "objectively clear" to Keske that Vanessa "suffered from an[] infirmit[y]" such that she could not be safely handcuffed, Vanessa's failure to inform Keske that her handcuffs were too tight is dispositive in Keske's favor. *Id*. at 769, 773 (holding that the defendant officers did not use excessive force in handcuffing the plaintiff, even though the plaintiff suffered two torn rotator cuffs requiring surgery, where the plaintiff "complained generally about pain after he was handcuffed … , without any elaboration regarding a preexisting injury or other infirmity"); *see also Howell v. Smith*, 853 F.3d 892, 899-90 (7th Cir. 2017) (holding that the officer did not use excessive force in handcuffing the plaintiff where the officer "was not overly forceful when placing him in handcuffs," and the plaintiff told the officer "that he recently had surgery that limited the mobility of his arm" but "never stated explicitly that he was in pain or actively suffering in any way"); *Sow*, 636 F.3d at 304 (holding that the officer did not use excessive force in handcuffing a plaintiff who once complained that the handcuffs were too tight, but who "presented no evidence that he provided any elaboration," "did not complain of any injury when he was taken to jail," and "did not receive any treatment resulting from the use of the handcuffs"); *Garcia v.*

*City of Chicago*, 2012 WL 601844, at *8 (N.D. Ill. Feb. 23, 2012) (holding that the officer did not use excessive force in handcuffing the plaintiff where he "stopped complaining about the handcuffs once he was in the police car, did not complain about the handcuffs when he arrived at the police station, did not report any physical injury or request medical treatment while in custody, and sought no medical treatment upon his release").  Although the Seventh Circuit "ha[s] on occasion recognized valid excessive force claims based on overly tight handcuffs," the plaintiffs in those cases, unlike Vanessa, complained to the defendants that their handcuffs were too tight.  *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (collecting cases).  Keske is therefore entitled to summary judgment as to the handcuffing.

As to the arm twisting, Keske is not entitled to summary judgment.  A reasonable juror could infer from Vanessa's lingering range-of-motion problems that Keske twisted her arm with enough force to cause injury.  *Cf. Avina v. Bohlen*, 882 F.3d 674, 678-79 (7th Cir. 2018) (holding that "[t]he regularity with which officers place individuals in handcuffs without incident," combined with the fact that the plaintiff's arm was broken in the process of the arrest, "raises at least an inference that this situation involved something more").  And viewing the facts in the light most favorable to Vanessa, a reasonable juror also could find that the arm twisting was "wholly gratuitous" and thus objectively unreasonable.  *See Clash v. Beatty*, 77 F.3d 1045, 1047-48 (7th Cir. 1996) (holding that the defendant's entitlement to qualified immunity turned on a genuine factual dispute as to whether the defendant's shoving the plaintiff into a police car after he offered to get in voluntarily, resulting in a knee injury, was "objectively unreasonable in light of the harm that [the plaintiff] then presented").

As noted, an officer cannot use more force than necessary to effectuate an arrest.  *See Becker*, 821 F.3d at 925; *Estate of Williams*, 797 F.3d at 473; *Cyrus*, 624 F.3d at 863.  The record

supports the inference that Vanessa was not resisting when Keske—without first giving her an opportunity to voluntarily put her arms behind her back—twisted her arm with enough force to cause lasting injury, thus going beyond what was necessary to handcuff her. Absent resistance, the force ordinarily required to handcuff a person carries little risk of injury. *See Avina*, 882 F.3d at 679 ("Police officers place cooperative suspects in handcuffs on a daily basis without causing even minor injuries."). The summary judgment record would thus enable a reasonable jury to conclude that Keske used excessive force in twisting Vanessa's arm during her arrest.

For substantially the same reasons, Keske is not entitled to qualified immunity as to the arm twist. It was clearly established by January 2015 "that police officers [may] not use significant force on nonresisting or passively resisting suspects," that "police officers cannot continue to use force once a suspect is subdued," *Abbott*, 705 F.3d at 732, and that "[f]orce is reasonable only when exercised in proportion to the threat posed," *Cyrus*, 624 F.3d at 863. Viewing the record in the light most favorable to Vanessa, Keske applied substantial force on her even though she was not resisting, making it "objectively unreasonable for [him] to believe that the force was lawful." *Estate of Williams*, 797 F.3d at 473 (internal quotation marks omitted). Accordingly, Keske is not entitled to qualified immunity on that aspect of Vanessa's claim.

Therefore, summary judgment is granted on Vanessa's excessive force claim as it relates to her overly tight handcuffs but denied as it relates to Keske's twisting her arm.

### 3. DeJesus

It is undisputed that Keske did not arrest, handcuff, or even speak to DeJesus, Doc. 130 at ¶¶ 45, 51, and Plaintiffs adduce no evidence that Keske otherwise used force against him. Accordingly, Keske is entitled to summary judgment on DeJesus's excessive force claim.

## II.    Federal Claims Against Arnony, Keske, and Robinzine Arising from Their Alleged Campaign of Harassment

### A.    Class-of-One Equal Protection Claim

Plaintiffs bring a Fourteenth Amendment class-of-one equal protection claim against Arnony, Keske, and Robinzine based on the alleged campaign of harassment they inflicted on Plaintiffs from Margarita's February 2014 complaint against them through Camacho's and Vanessa's January 5, 2015 arrests, as well as on Arnony's and Keske's behavior during the subsequent state court proceedings. Doc. 1 at ¶¶ 4, 57-60. Unlike a traditional equal protection claim, which alleges that the plaintiffs "have been arbitrarily classified as members of an identifiable group," a class-of-one claim "asserts that an individual has been irrationally singled out, without regard for any group affiliation, for discriminatory treatment." *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (internal quotation marks omitted). "Courts must handle class-of-one claims carefully to avoid turning every squabble over municipal services, of which there must be tens or even hundreds of thousands every year, into a federal constitutional case." *Brunson v. Murray*, 843 F.3d 698, 708 (7th Cir. 2016) (internal quotation marks omitted). To prevail, "a class-of-one plaintiff must show (1) that he has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment." *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014). In *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc), the Seventh Circuit split three ways, without mustering a majority, on the question whether "a class-of-one plaintiff must also … prove[] that the government officials acted with some kind of bad motive not grounded in their public duties." *Fares Pawn*, 755 F.3d at 845; *see also Brunson*, 843 F.3d at 706 (recounting the three-way split in *Del Marcelle*). There is no need to take sides here because, for each of the actions challenged by Plaintiffs, no reasonable jury could find that there

was no conceivable rational basis for the action, no reasonable jury could find that Defendants intentionally treated Plaintiffs differently from others similarly situated, or no reasonable jury could find that Defendants were personally responsible for the action.

Plaintiffs argue that if they prove that Defendants bore animus against them, they need not prove that the challenged action lacked a rational basis. Doc. 129 at 4-5. That argument is incorrect. Under all three standards proposed in *Del Marcelle*, if the court "can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no." *Fares Pawn*, 755 F.3d at 845; *see also Miller v. City of Monona*, 784 F.3d 1113, 1121-22 (7th Cir. 2015) (same). In advancing the contrary position, Plaintiffs cite *Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013), and *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012). Those cases are inapposite, for they concern when a class-of-one plaintiff must identify a comparator to prove discriminatory treatment. *See Swanson*, 719 F.3d at 783-85 (holding that "a clear showing of animus, absent a robust comparison to a similarly situated individual," was sufficient to permit a reasonable juror to find discriminatory treatment); *Geinosky*, 675 F.3d at 747-48 (holding that the plaintiff was not required to identify a specific comparator in his complaint because, given his allegation that he received twenty-four bogus parking tickets in fourteen months, "the pattern and nature of defendants' alleged conduct d[id] the work of demonstrating the officers' improper discriminatory purpose"); *see also Fares Pawn*, 755 F.3d at 845 n.3 (citing *Swanson* and *Geinosky* for the proposition that, "[i]n unusual circumstances, where plaintiffs put forth what amounts to direct evidence of arbitrary treatment, we have allowed them to mount a class-of-one claim without pointing to comparators"). Indeed, both *Swanson* and *Geinosky* recognize that a class-of-one plaintiff must prove not only intentional discrimination, but also the absence of a conceivable rational basis for the defendant's conduct. *See Swanson*, 719 F.3d at 783; *Geinosky*,

675 F.3d at 747. This stands to reason—as the Seventh Circuit explained, animus alone does not establish lack of a rational basis because an "action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity." *Fares Pawn*, 755 F.3d at 845 (internal quotation marks omitted).

As for the first element of a class-of-one claim, a plaintiff can prove discriminatory treatment either by identifying similarly situated comparators whom the defendant treated more favorably or by proving a pattern of discriminatory conduct. *See Brunson*, 843 F.3d at 706-07. As to the first method, Plaintiffs' only suggested comparators are "the residents of Berwyn." Doc. 129 at 4. That is plainly insufficient, as precedent requires Plaintiffs "to find someone … that shared with [them] all the principal, pertinent characteristics." *Black Earth Meat Market, LLC v. Vill. of Black Earth*, 834 F.3d 841, 851-52 (7th Cir. 2016) (holding that a restaurant/bar was not sufficiently similar to the plaintiff slaughterhouse because the restaurant/bar was not responsible for similar externalities and had not been the subject of neighbors' complaints); *Fares Pawn*, 755 F.3d at 845 ("The theory behind this approach is that if all principal characteristics of the two individuals are the same, and one received more favorable treatment, this may show there was no proper motivation for the disparate treatment.") (internal quotation marks omitted). Because Plaintiffs cannot possibly share all principal, pertinent characteristics with every Berwyn resident, no reasonable jury could find that "the residents of Berwyn" were similarly situated to Plaintiffs for purposes of their claim. *See Fares Pawn*, 755 F.3d at 846 ("[S]ummary judgment is appropriate where it is clear that no reasonable jury could find that the similarly situated requirement has been met.") (internal quotation marks omitted). Accordingly, Plaintiffs cannot rely on a comparator method to prove the discriminatory treatment element of their claim.

The second method of proving discriminatory treatment is to show a "pattern" of conduct that "demonstrate[s] on its own," without identifying comparators, "the officers' improper discriminatory purpose." *Brunson*, 843 F.3d at 707 (internal quotation marks omitted) (reversing summary judgment where the plaintiff "offered evidence of a pattern of discriminatory behavior on the part of a government," including repeated visits to his liquor store to inform him of violations of "non-existent state and local liquor laws," a "proposed local rule that would have driven only him out of business," an "arbitrar[y] refus[al] to act on his license renewal," and an attempt to "intimidate [his] liquor supplier"); *Geinosky*, 675 F.3d at 748 ("[R]equiring [the plaintiff] to name a similarly situated person who did not receive twenty-four bogus parking tickets in 2007 and 2008 would not help distinguish between ordinary wrongful acts and deliberately discriminatory denials of equal protection."). The court will examine the conduct alleged by Plaintiffs to determine whether they can prevail under this method.

### 1.     Arnony

Plaintiffs' class-of-one claim rests in part on Arnony's conduct while investigating the burglary complaint against Vanessa and the criminal damage to property complaint against Camacho. That conduct cannot ground Plaintiffs' claim because Arnony acted with a rational basis. Margarita's reports that Vanessa had burglarized her house and that Camacho had broken her car mirrors gave Arnony a rational basis to investigate Vanessa's and Camacho's involvement in those alleged crimes. *See Black Earth*, 834 F.3d at 851 (holding that neighbors' complaints about the plaintiff slaughterhouse provided a rational basis for municipal officials' attempts to force the slaughterhouse to move its operations and to "build[] a record in anticipation of a nuisance abatement suit" by stepping up ordinance enforcement). It is axiomatic that an officer investigating an alleged crime has a rational basis to interview the

suspects identified by the victim and to call the suspects to request that they come in for questioning.  It follows that the ongoing investigation and Margarita's requests for a premise watch gave Arnony a rational basis for his March 2014 premise watch email, his November 2014 email discussing the investigation's status, and his January 2015 premise watch memo.

Plaintiffs argue that Arnony's November 2014 email trumped up the allegations against Camacho by stating that he "needs to be felony reviewed for" criminal damage to property even though $413.74 worth of damage is below the threshold for a felony.  Doc. 129 at 6; Doc. 131-3. This argument fails because, as noted above, there was a $300 felony threshold in effect at the time.  *See* 720 ILCS 5/21-1(a)(1), (d)(1)(F) (2014) (amended 2017).

Even if Arnony lacked a rational basis for this conduct, it would fall short of the kind of pattern that would enable a reasonable juror to conclude that he intentionally treated Plaintiffs differently from others similarly situated.  Without knowing how Arnony has handled other investigations, no reasonable juror could conclude that his handling of this investigation was intentionally discriminatory.  Accordingly, Arnony's conduct during the investigation cannot give rise to a class-of-one claim.

Plaintiffs' class-of-one claim also rests on Arnony's giving them dirty looks when they appeared in court.  Even if Plaintiffs could prove that Arnony singled them out for this treatment, dirty looks are too insignificant a harm to ground a federal class-of-one equal protection claim. *See Geinosky*, 675 F.3d at 747 ("One element of a proper class-of-one-claim is a *wrongful act* that necessarily involves treatment departing from some norm or common practice.") (emphasis added); *see also Del Marcelle*, 680 F.3d at 895 (opinion of Posner, J.) (noting that "courts generally agree that only egregious class-of-one cases should be actionable in the name of the Constitution," and suggesting that the principle *de minimis non curat lex* applies to class-of-one

claims) (emphasis omitted); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("[E]ven in the field of constitutional torts *de minimis non curat lex*. Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that … if the Mayor of Springfield had frowned at [the plaintiff] for running for public office [it would be actionable retaliation]."); *Shaw v. Wall*, 2014 WL 7215764, at *3-4 (W.D. Wis. Dec. 17, 2014) (holding that "the denial of a single phone call was a *de minimis* imposition that does not rise to the level of a constitutional violation" on a class-of-one theory); *Crudup v. Barton*, 2000 WL 1644369, at *2 (N.D. Ill. Oct. 24, 2000) ("Dirty looks and vague mutterings do not violate one's constitutional rights … .").

### 2. Keske

Plaintiffs' class-of-one claim also rests in part on Keske's arresting and using force against Camacho and Vanessa on January 5, 2015, his following Camacho home on one occasion, and his waving at Plaintiffs when they appeared in court. As shown above, Keske had probable cause to arrest Camacho and Vanessa—probable cause gave him a rational basis for making the arrests. *See Williamson v. Curran*, 714 F.3d 432, 449 (7th Cir. 2013) ("[T]he class-of-one equal protection claim hinges on the notion that the authorities lacked probable cause to arrest Williamson, as the existence of probable cause necessarily means that there was a legitimate reason to arrest her."). As to Keske's use of force, tailing Camacho, and courtroom greetings, no reasonable juror could find without a comparator that those actions amounted to a pattern of conduct sufficient to show discriminatory treatment sufficient to support a class-of-one claim. *See Brunson*, 843 F.3d at 707 (noting that to eliminate the need to identify a comparator, a pattern of conduct must "signal that the plaintiff alone suffered the defendant's harassment"); *Geinosky*, 675 F.3d at 749 ("We are not inviting every driver with a couple of parking tickets

(even invalid ones) to sue in federal court."); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1009 (7th Cir. 2004) ("Even if McDonald was wronged here, we do not believe that he has shown the wrong to be discriminatory in nature. Every time an actor commits a tort, he may be treating the victim differently than he frequently treats others, simply because tortious conduct is by nature a departure from some norm. Nonetheless, the purpose of entertaining a 'class of one' equal protection claim is not to constitutionalize all tort law nor to transform every claim for improper provision of municipal services or for improper conduct of an investigation in connection with them into a federal case. Therefore, we believe a meaningful application of the 'similarly situated' requirement is important to avoiding a distortion of the scope of protection in 'class of one' equal protection claims.") (citations omitted).

### 3. Robinzine

Plaintiffs' class-of-one claim also rests in part on Robinzine's alleged intimidation of Plaintiffs. The record contains evidence of three instances of conceivably intimidating behavior: Robinzine photographed Vanessa's car; he called Vanessa to tell her that Margarita was filing a burglary charge and that she should go to the police station to sort it out; and he warned Camacho to stay out of trouble. Doc. 130 at ¶¶ 54, 56, 58, 60-61. Even setting aside the questions whether this conduct is serious enough to ground a class-of-one claim and whether Robinzine acted with a rational basis, it falls far short of the sort of facially discriminatory pattern that obviates the need for comparator evidence. *See Brunson*, 843 F.3d at 707; *Geinosky*, 675 F.3d at 749; *McDonald*, 371 F.3d at 1009.

### 4. Police Activity

Plaintiffs also cannot rest their class-of-one claim on police activity near their house— police vehicles driving by or parked at the end of the block, and police patrolling the park and

telling Plaintiffs that they were there too early.  First, while Plaintiffs bring their class-of-one

claim against only Arnony, Keske, and Robinzine, Doc. 1 at ¶¶ 9, 57-60, the only police activity

linked to those officers is the two times Keske drove by their house.  Doc. 138 at ¶ 19; Doc. 108-

13 at 226-227.  Second, the police activity all had a rational basis: Plaintiffs' house is within five

blocks of the police station and near a park with a significant amount of police activity, so there

is no plausible reason to believe that the officers were doing anything other than just passing by.

Moreover, it is rational for the police to maintain a presence in a neighborhood within their

jurisdiction to deter crime and enforce the law.  Third, because it is not self-evident that the level

of police activity Plaintiffs describe is a function of intentional discrimination, Plaintiffs were

required to adduce evidence of a comparator, which they did not.  *See Brunson*, 843 F.3d at 707;

*Geinosky*, 675 F.3d at 749; *McDonald*, 371 F.3d at 1009.

### 5.    Parking Tickets

The strongest evidence that Plaintiffs were singled out for unfavorable treatment is the

series of seven or eight later-dismissed parking tickets, at least some of which—including the

street cleaning tickets on days without street cleaning, and a parking ticket for running a stop

sign at a time when the car was unoccupied—were bogus.  Doc. 130 at ¶ 49; Doc. 138 at ¶ 18;

Doc. 108-13 at 194, 272-273.  In *Geinosky*, the Seventh Circuit held that the series of twenty-

four tickets in that case crossed the line for class-of-one purposes "[s]omewhere between the first

several and the twenty-fourth bogus tickets from officers of the same police unit."  675 F.3d at

748.  There is no need to determine where the eight tickets in this case fall along that spectrum,

however, because Plaintiffs adduce no evidence that the individual defendants (Arnony, Keske,

and Robinzine) were involved in issuing *any* of the tickets.  Doc. 130 at ¶ 49 (citing only

Camacho's and Vanessa's deposition testimony about the tickets); Doc. 138 at ¶¶ 13, 17-18

(same); Doc. 108-12 at 57-58 (Vanessa testifying that she did not recall whether the same or a different officer signed the tickets); Doc. 108-13 at 193-195, 271-273 (Camacho testifying that unspecified officers issued bogus parking tickets and that he did not recall who issued the parking ticket for running a stop sign). Accordingly, any class-of-one claim based on the tickets cannot be brought against those defendants. *See Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) ("[T]o be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation.") (internal quotation marks omitted).

### B. Substantive Due Process Claim

The alleged campaign of harassment underlying Plaintiffs' class-of-one claim also grounds their substantive due process claim against Arnony, Keske, and Robinzine. Doc. 1 at ¶¶ 61-63; Doc. 129 at 6-8. As relevant here, substantive due process protects individuals from "abuse[s] of government power which 'shock[] the conscience.'" *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). The "shock the conscience" standard is difficult to meet, for "every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1994); *see also Geinosky*, 675 F.3d at 750 (noting that it is not necessarily enough for the conduct to be "abhorrent"). "'[O]nly the most egregious official conduct' can be said to violate this standard." *Catinella v. Cnty. of Cook*, 881 F.3d 514, 519 (7th Cir. 2018) (alteration in original) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Defendants argue that Plaintiffs may not seek relief under a substantive due process theory for conduct that falls within the ambit of a specific constitutional provision. Doc. 115 at 11; Doc. 139 at 4-5. As to any conduct within the scope of the Fourth Amendment—Keske's

arrest of Camacho and Vanessa, use of force against them, and entry into their home—Plaintiffs

forfeited this issue by failing to respond to Defendants' argument. *See Nichols*, 755 F.3d at 600;

*Keck Garrett*, 517 F.3d at 487; *Witte*, 434 F.3d at 1038.

Even setting aside forfeiture, Defendants are correct on the merits. Where a particular

"Amendment provides an explicit textual source of constitutional protection against [a certain

kind of government behavior], that Amendment, not the more generalized notion of 'substantive

due process,' must be the guide for analyzing these claims." *Graham*, 490 U.S. at 395; *see also*

*United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a

specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be

analyzed under [that] standard … ."); *Kernats*, 35 F.3d at 1182 ("The nature of the allegations

falls clearly within the ambit of those activities regulated by the Fourth Amendment (even if not

clearly within the ambit of the Fourth Amendment's prohibitions), and there was no need for the

district court to further analyze the case under the strictures of the Fourteenth Amendment."). As

discussed above, Plaintiffs claim that Keske violated their Fourth Amendment rights by entering

their home, arresting them, and using force against them. It follows that Plaintiffs may not also

seek relief for that conduct under a substantive due process theory. *See Eby-Brown Co. v. Wis.*

*Dep't of Agric.*, 295 F.3d 749, 753-54 (7th Cir. 2002) (rejecting a substantive due process claim

on the ground that the plaintiff's "arguments [were] more properly considered claims under the

equal protection clause alone").

The same result obtains for the alleged campaign of harassment, which Plaintiffs' class-

of-one equal protection claim characterizes as unequal treatment motivated by personal animus.

*Ibid.*; Doc. 129 at 7-8 (where Plaintiffs contend that their substantive due process claim is based

on "harassment directed towards them out of sheer malice"). And even if the alleged campaign

of harassment did not fall within the ambit of the Equal Protection Clause, no reasonable juror could find that the conduct constituting the harassment "shocks the conscience." *Tun*, 398 F.3d at 902 (internal quotation marks omitted). Investigating allegations of criminal conduct, waving at Plaintiffs or giving them dirty looks, making phone calls and statements that Plaintiffs viewed as intimidating, maintaining a police presence near Plaintiffs' house, and the other conduct addressed above, whether viewed individually or in combination, are a far cry from the sort of abuses that "shock[] the conscience in the sense required in due process cases." *Geinosky*, 675 F.3d at 750 (internal quotation marks omitted) (holding that issuing twenty-four bogus parking tickets to the plaintiff over a fourteen-month period did not shock the conscience); *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010) (holding that conduct did not shock the conscience where the officers violated internal rules by tracing a phone call, misusing a police database, and "travel[ing] outside their jurisdiction to track [the plaintiff] down at his house at night"); *Tun*, 398 F.3d at 902-03 ("Cases abound in which the government action—though thoroughly disapproved of—was found not to shock the conscience.").

## C.     Section 1983 Conspiracy Claim

Plaintiffs' § 1983 conspiracy claim against Arnony, Keske, and Robinzine alleges that Robinzine orchestrated Plaintiffs' arrests and the purported campaign of harassment "to further his sexual interests, maintain his relationship with [Margarita], and conceal [his] extra-marital affair from his wife." Doc. 1 at ¶¶ 1-3, 64-69. "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance [of the conspiracy] actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs

can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Id*. at 511. Significant here, conspiracy liability under § 1983 requires an underlying constitutional violation for which the defendant is not entitled to qualified immunity. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017) ("Section 1983 does not reach a conspiracy to deny a civil right in the absence of an actual denial of such a right."); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("[B]ecause the Defendants are entitled to qualified immunity on the underlying claims, they are entitled to judgment on the corresponding conspiracy claims."); *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."). The scope of Plaintiffs' conspiracy claim is thus limited to their surviving constitutional claims: Camacho's and Vanessa's Fourth Amendment excessive force claims.

To prevail on their conspiracy claim, Camacho and Vanessa must prove an agreement among the defendant officers to violate their Fourth Amendment rights. Camacho and Vanessa may do so by establishing that the officers "underst[ood] the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *McCann v. Mangialardi*, 337 F.3d 782, 789-90 (7th Cir. 2003) (emphasis and internal quotation marks omitted). If the agreement was not overt, Camacho and Vanessa must point to acts that are "sufficient to raise the inference of mutual understanding (*i.e.*, the acts performed by the members of a conspiracy are unlikely to have been undertaken without an agreement)." *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (internal quotation marks omitted).

No reasonable juror on the summary judgment record could find an agreement among the individual officers. As noted, it is undisputed that nobody in the Berwyn Police Department

knew of Robinzine's affair with Margarita—which allegedly provided the motive for the

conspiracy—and that neither Arnony nor Keske acted at Robinzine's behest. Doc. 130 at ¶¶ 37,

41, 63-66. Plaintiffs nonetheless contend that an agreement can be inferred from three facts:

(1) Robinzine's involvement in Arnony's investigation; (2) Arnony's email indicating that

Camacho should be "felony reviewed"; and (3) the failure to obtain a warrant to arrest Vanessa

for assaulting Margarita after Arnony suggested in the same email that she was a suspect.

Doc. 129 at 10. As noted, the first finds no support in the record, and the second is not at all

suspicious because the conduct Arnony described was a felony at the time. The third falls short

as well, as Arnony's apparent decision *not* to pursue an assault charge against Vanessa does not

show that he was out to get her, much less that he formed an agreement to do so.

Because Plaintiffs cannot show that Arnony, Keske, and Robinzine reached an agreement

to violate their constitutional rights—and, in particular, to commit excessive force against them

during their arrests—those defendants are entitled to summary judgment on the § 1983

conspiracy claim.

## III.    State Law Claims Against Arnony, Keske, and Robinzine

Plaintiffs bring state law conspiracy, intentional infliction of emotional distress, and

negligent infliction of emotional distress claims against Arnony, Keske, and Robinzine based on

the alleged campaign of harassment described above. Doc. 1 at ¶¶ 70-75, 92-102. Defendants

argue that those claims are untimely. Doc. 110 at 2. Illinois provides a one-year statute of

limitations for civil actions against Illinois local government entities and their employees. *See*

745 ILCS 10/8-101(a). Camacho's and Vanessa's arrests took place on January 5, 2015, and

Plaintiffs admit that the campaign of harassment, oppression, and discrimination underlying their

claims ended on that date.  Doc. 130 at ¶ 62.  Plaintiffs brought this suit more than one year later, on May 10, 2016, meaning that their state law claims are untimely.

Pressing the opposite result, Plaintiffs argue that their claims are timely because they "are based on Defendants' ongoing actions relating to harassing and arresting defendants, including up to the time the criminal cases were dismissed" in August 2016.  Doc. 129 at 26; Doc. 130 at ¶ 48.  True enough, the statute of limitations under Illinois law for a continuing violation "does not begin to run until the date of the last injury or the date the tortious acts cease."  *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003) (internal quotation marks omitted).  Significantly, however, a continuing violation requires "continuing *unlawful* acts and conduct."  *Ibid*. (emphasis added).  Plaintiffs' argument falls short on this point.

The only alleged conduct that occurred after January 5, 2015 was Keske's waving and Arnony's dirty looks when Plaintiffs appeared in court.  Doc. 130 at ¶¶ 55, 62.  Waving at people and giving them dirty looks is not unlawful.  *See In re Krueger*, 192 F.3d 733, 741-42 (7th Cir. 1999) ("Illinois courts … recognize the doctrine of *de minimis non curat lex*, which means that courts will not regard trifles.") (internal quotation marks omitted); *Dix v. Edelman Fin. Servs., LLC*, 2018 WL 1115937, at *5 (N.D. Ill. Feb. 28, 2018) (holding that the plaintiff failed to state an intentional infliction of emotional distress claim under Illinois law because the defendant's "alleged conduct amounts to *de minimis* indignities or trivialities at worst"); *Sturdy v. Medtrak Educ. Servs. LLC*, 2014 WL 2727200, at *3 (C.D. Ill. June 16, 2014) ("[T]he harm to Plaintiff of a single unsolicited fax advertisement is so minimal that the doctrine of *de minimis non curat lex* bars recovery on Plaintiff's [Illinois law] claims.").  And although it is true that, for an intentional infliction of emotional distress claim, a "pattern, course, and accumulation of acts can make an individual's conduct sufficiently extreme to be actionable, whereas one instance of such

behavior might not be," *Feltmeier*, 798 N.E.2d at 79-80, 83, 89 (internal quotation marks omitted) (holding that the continuing violation doctrine applied where the plaintiff alleged an ongoing pattern of physical and emotional domestic abuse), the waving and dirty looks are so innocuous that adding them to Defendants' earlier conduct would not move the needle toward finding that their conduct as a whole meets the "truly extreme and outrageous" standard, *id.* at 80, for that tort. In any event, Plaintiffs do not respond to Defendants' argument that their conduct as a whole fell short of extreme and outrageous, thus forfeiting the point and their intentional infliction of emotional distress claim. *See Nichols*, 755 F.3d at 600; *Keck Garrett*, 517 F.3d at 487; *Witte*, 434 F.3d at 1038.

## IV.     Section 1983 Supervisory Liability Claim Against Ritz

Plaintiffs' only claim against Ritz is for supervisory liability under § 1983. Doc. 1 at ¶¶ 103-108. Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper*, 430 F.3d at 810 (internal quotation marks omitted). The mere fact that Ritz holds a supervisory position in the Berwyn Police Department is insufficient to make him liable under § 1983 for his officers' misconduct, as the *respondeat superior* doctrine does not apply to § 1983 claims. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).

"Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (brackets and internal quotation marks omitted). Rather, to be held liable under § 1983, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with

deliberate, reckless indifference." *Ibid.* (internal quotation marks omitted); *see also Sides v. City of Champaign*, 496 F.3d 820, 827 (7th Cir. 2007) (similar). Some causal connection or affirmative link between the complained-of action and the official sued is necessary for § 1983 recovery. *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003).

Plaintiffs contend that Ritz is liable because, as the chief of police, "it was his responsibility through the chain of command to ensure that detective and patrol officers protected the constitutional rights of citizens," and because he had "ultimate authority concerning the training [of officers] and supervision of criminal investigations." Doc. 129 at 24. Even setting aside Plaintiffs' failure to cite anything in the record to support the facts underlying those assertions, Ritz's position atop the chain of command falls far short of the degree of involvement required for § 1983 liability. *See Sanville*, 266 F.3d at 739-40 (holding that the plaintiff failed to state a § 1983 claim against prison wardens where the plaintiff alleged that the wardens "tolerat[ed] a number of transgressions" by their subordinates, but where none of the allegations suggested that the wardens were personally responsible for or turned a blind eye to "any particular conduct"). Plaintiffs do not argue—and, in any event, the record does not support—that Ritz "kn[e]w about," "facilitate[d]," "approve[d]," "condone[d]," or "turn[ed] a blind eye" to any violation of their constitutional rights. *Chavez*, 251 F.3d at 651. To the contrary, the only facts about Ritz's role presented in the parties' Local Rule 56.1 statements and responses show that Ritz did not learn about the allegations underlying Plaintiffs' complaint until after they sued, that Plaintiffs did not know him, and that Plaintiffs have never spoken to him. Doc. 130 at ¶ 59. Ritz is therefore entitled to summary judgment.

## V. *Monell* Claim Against the City

Plaintiffs bring a *Monell* claim against the City, alleging that it caused its officers'

constitutional violations by failing to adequately train or supervise them.  Doc. 1 at ¶¶ 109-112;

*see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  As a threshold matter, Plaintiffs cannot

maintain a *Monell* claim absent an underlying constitutional injury.  *See Petty v. City of Chicago*,

754 F.3d 416, 424 (7th Cir. 2014) ("[I]f no constitutional violation occurred in the first place, a

*Monell* claim cannot be supported."); *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th

Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying

constitutional violation by a municipal employee.").  Thus, the *Monell* claim can rest on the

alleged constitutional violations on which Plaintiffs survive summary judgment: Camacho's and

Vanessa's excessive force claims.  The *Monell* claim also can rest on the alleged constitutional

violations for which the individual officers are entitled to summary judgment on qualified

immunity grounds only: the unlawful entry claim and the portion of Camacho's excessive force

claim arising from Keske's tackling him.  *See Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir.

2012) (affirming summary judgment for the individual defendants on qualified immunity

grounds, but remanding the plaintiff's *Monell* claim because municipalities are not eligible for

qualified immunity) (citing *Owen v. City of Independence*, 445 U.S. 622, 638 (1980)); *Thomas v.

Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) ("[A] municipality can be held

liable under *Monell*, even when its officers are not, unless such a finding would create an

inconsistent verdict.") (emphasis omitted).

Plaintiffs package their *Monell* claim as a failure-to-train claim.  Doc. 1 at ¶¶ 109-112.

"[A] municipality may be directly liable [under *Monell*] for constitutional violations by its

officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by

failing to train adequately its officers to prevent the violation … ." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *see also Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) ("*Monell* requires [the plaintiff] to show that [the defendant] adopted a policy or had a custom of poor training or inadequate supervision. Alternatively, [the plaintiff] could show that [the defendant]'s failure to train or supervise its officers amounted to deliberate indifference to the rights of people with whom the police came in contact.") (citation omitted). To give rise to liability, the failure to train or supervise "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (brackets and internal quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action … necessary to trigger municipal liability." *Id*. at 62 (citation and internal quotation marks omitted). In addition to demonstrating that the municipality was deliberately indifferent, the plaintiff must also prove causation, meaning that the failure to train or supervise was the "moving force behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (internal quotation marks omitted); *see also Connick*, 563 U.S. at 59 n.5 (noting that deliberate indifference and causation are separate elements of a failure-to-train claim).

In opposing summary judgment, Doc. 129 at 21-22, Plaintiffs do not identify any way in which the City's training or supervision of its police officers was deficient, thus forfeiting the issue and their *Monell* claim. *See Nichols*, 755 F.3d at 600; *Keck Garrett*, 517 F.3d at 487; *Witte*, 434 F.3d at 1038. Even setting aside forfeiture, no reasonable juror could find from the

summary judgment record that the City's training program was deficient. The basic police academy training—which the City supplements with a three-month field training program, an annual weeklong training program, and other ongoing training—addresses topics including probable cause and the use of force. Doc. 130 at ¶¶ 13-14, 17. Plaintiffs adduce no evidence suggesting that anything was missing from this training program or that anything was wrong with how the City supervised its officers. The mere fact that officers committed a constitutional violation is insufficient to show that the municipality failed to train or supervise them. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

Plaintiffs' brief suggests that their real quarrel is not with how the City trains or supervises its officers, but rather with the City's purported "policy to arrest persons if there was only probable cause to detain them for questioning." Doc. 129 at 22. Viewed in this light, Plaintiffs' *Monell* claim appears to be a policy or practice claim. "An official policy or custom may be established by means of [1] an express policy, [2] a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or [3] through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Estate of Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012); *see also Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). Plaintiffs do not adduce facts sufficient to support any of these three theories.

To advance their policy or practice claim, Plaintiffs rely on two assertions in their Local Rule 56.1(b)(3)(C) statement, Doc. 129 at 21-22 (citing Doc. 138 at ¶¶ 11, 31), but neither is supported by the cited record materials. First, Plaintiffs assert that "Keske states he interpreted"

Arnony's January 2, 2015 premise watch memo, which said that "there are no warrants for Camacho," "to mean that he should arrest Camacho." Doc. 138 at ¶ 11. The portion of Keske's deposition transcript cited by Plaintiffs does not support that assertion; rather, Keske testified that he understood the term "probable cause to detain" in the memo to mean "arrest." Doc. 108-4 at 92-93.

Second, Plaintiffs assert that the City had "a policy to arrest people if there was probable cause to detain [them] for questioning," citing Keske's entire deposition transcript and portions of Arnony's and Ortiz's deposition testimony. Doc. 138 at ¶ 31. As to Keske's transcript, a party may not support an assertion in a Local Rule 56.1 statement or response by citing an entire deposition transcript. *See Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 850 (7th Cir. 2015) ("It is not the court's role or obligation to read an entire deposition or affidavit in an effort to locate the particular testimony a party might be relying on; the court ought to *know* what portion of a witness's testimony the party is invoking so that it can focus its attention on that testimony and assess whether it is admissible and actually supports the fact or inference for which it is cited."); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (affirming the district court's decision to disregard Local Rule 56.1 responses on the ground that they "cited an entire deposition transcript rather than specific page references"); *Erwin v. U.S. Dep't of State*, 2014 WL 242786, at *2 (N.D. Ill. Jan. 22, 2014) ("Rather than cite specific record material, certain parts of Erwin's Local Rule 56.1(b)(3)(B) response and Local Rule 56.1(b)(3)(C) statement cited entire documents without indicating where in those documents the relevant material appeared. … [T]his violated Local Rule 56.1."). And the cited portions of Arnony's and Ortiz's deposition testimony do not support Plaintiffs' assertion. Doc. 108-3 at 180-181 (Arnony testifying that in November 2014, he believed that he had probable cause to

"[d]etain, arrest, bring in" Camacho and Vanessa); Doc. 108-10 at 137-138 (Ortiz testifying that he believed that Arnony followed department policies and procedures as to the premise watch memo).

Plaintiffs do not argue that a reasonable jury could infer any municipal policy or practice from Keske's conduct on January 5, 2015, thus forfeiting the point. *See Nichols*, 755 F.3d at 600; *Keck Garrett*, 517 F.3d at 487; *Witte*, 434 F.3d at 1038. Such an argument would fail on the merits as well. To give rise to *Monell* liability, municipal employees' conduct must occur frequently enough to raise a reasonable inference that the public employer is "aware that public employees engage in the practice and do so with impunity." *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) (internal quotation marks omitted). While there is no clear consensus as to how often the offending conduct must occur to constitute a custom, "it must be more than one instance, or even three." *Thomas*, 604 F.3d at 303 (citation and internal quotation marks omitted). Plaintiffs can at most point to a single unlawful entry and two instances of excessive force, all by the same officer, on the same day, and as part of the same incident. It follows that Keske's conduct on January 5, 2015 does not demonstrate a sufficiently widespread custom to support a *Monell* claim. *See Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.") (internal quotation marks omitted).

Accordingly, because the factual predicate of Plaintiffs' *Monell* claim is not supported by the record, the claim fails.

## VI.    Indemnification Claim

Plaintiffs bring an indemnification claim against the City under section 9-102 of the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("TIA"), 745 ILCS 10/1-101 *et seq*., alleging that the City is liable for Arnony's, Keske's, and Robinzine's actions.  Doc. 1 at ¶¶ 113-115; *see* 745 ILCS 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment … for compensatory damages … for which it or an employee while acting in the scope of his employment is liable in the manner provided in this Article."). The City argues that it is entitled to summary judgment under section 2-109 of the TIA. Doc. 115 at 16.  Section 2-109 provides: "A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."  745 ILCS 10/2-109. Because Keske is not entitled to summary judgment on Camacho's and Vanessa's excessive force claims, the City is not entitled to summary judgment on their indemnification claims arising from Keske's conduct.  Conversely, none of DeJesus's claims against the individual Defendants survive summary judgment, so neither does his indemnification claim against the City.

## VII.    Damages

Finally, Defendants seek summary judgment as to three categories of damages: (1) Camacho's and Vanessa's lost earnings; (2) damages related to the foreclosure proceedings involving their home, proceedings that ultimately were dismissed; and (3) damages related to the repossession of their car.  Doc. 115 at 16-19.  The conduct underlying Plaintiffs' sole surviving claims—Keske's alleged excessive force against Camacho and Vanessa—bears no causal relationship to those financial harms.  Doc. 129 at 24-25 (attributing those harms to the fact of

Camacho's and Vanessa's arrests); Doc. 138 at ¶¶ 32-34 (same).  Accordingly, Defendants are entitled to summary judgment as to those categories of damages.

**Conclusion**

Arnony's and Robinzine's summary judgment motions are granted.  Keske's motion is granted in part and denied in part, as is the City and Ritz's motion.  The case will proceed to trial on Camacho's excessive force claim against Keske concerning Keske's pinning Camacho to the ground, and on Vanessa's excessive force claim against Keske concerning his twisting her arm while making the arrest; in addition, Camacho's and Vanessa's indemnification claims against the City survive as to those claims.  Keske and the City are granted summary judgment on the remaining claims against them, and Ritz, Arnony, and Robinzine are granted summary judgment on all claims against them.

November 15, 2018

_____
United States District Judge